**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3174
_____

SUNIL K. GARG, Relator, on behalf of the
United States of America, and the State of
New Jersey; UNITED STATES OF AMERICA

v.

COVANTA HOLDING CORPORATION,
a Delaware Corporation; COVANTA
ENERGY CORPORATION, a Delaware
Corporation; COVANTA UNION, INC.,
a New Jersey Corporation

Sunil K. Garg,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 10-cv-04036)
District Judge: Honorable Jose L. Linares
_____

Submitted Under Third Circuit LAR 34.1(a)
April 17, 2012
_____

Before: VANASKIE, BARRY and CUDAHY,[*] Circuit Judges

(Opinion Filed: May 8, 2012)

_____

[*] Honorable Richard D. Cudahy, Senior Circuit Judge for the United States Court of
Appeals for the Seventh Circuit, sitting by designation.

---

OPINION

---

BARRY, Circuit Judge

Appellant Sunil Garg ("Garg") appeals the District Court's dismissal of his claims against Covanta Union, Inc., and related corporate entities (collectively, "Covanta") under both the Federal False Claims Act and the New Jersey False Claims Act. We will affirm.

## I.

Because this case comes to us on appeal from a motion to dismiss, we accept as true the facts pleaded in Garg's complaint. *Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 74 (3d Cir. 2011).

## A.

Garg is the executive director of the Union County Utilities Authority ("UCUA"), an instrumentality of the State of New Jersey empowered to process and handle solid waste in Union County, New Jersey. In 1991, UCUA issued $280 million dollars in bonds to finance the construction of a solid waste disposal facility ("the facility") in Rahway, New Jersey. UCUA also entered into a service agreement with Covanta,[1] under which Covanta would construct, operate, and maintain the facility on behalf of UCUA.

---

[1] At the time, Covanta was known as Ogden Martin Systems of Union, Inc.

2

The facility was completed and began operations in 1994. In order to pay the debt incurred in constructing the facility, UCUA charged so-called "tipping fees" per ton of solid waste processed at the facility. UCUA was able to charge these fees at an above-market rate because, under New Jersey's "flow control" laws, the new facility had exclusive processing rights for solid waste disposal within the county. In 1997, however, this Court declared these "flow control" laws unconstitutional.[2]

In 1998, in light of the invalidity of the flow control laws, UCUA engaged in a substantial restructuring. In particular, UCUA terminated its existing service agreement with Covanta and entered into new contracts. Under the new agreements, UCUA leased the facility to Covanta for 30 years and turned over all active waste disposal operations to the company. Covanta obtained the permits necessary to allow it, a private entity, to engage in the solid waste business, and took over complete control of the facility. UCUA assumed the role of a regulatory authority. UCUA also issued a new series of federal and state tax-exempt bonds, and repaid the 1991 bonds used to construct the facility.

Pursuant to these new agreements, Covanta submitted invoices billing UCUA for the performance of waste disposal services. These invoices were provided on a monthly basis and, according to Garg, contain "an express and/or implied certification" that Covanta is in full compliance with the terms of the contracts and all applicable laws.

---

[2] *See Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County*, 112 F.3d 652 (3d Cir. 1997) (holding that flow control laws violate the Dormant Commerce Clause and citing *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383 (1994)).

Garg alleges, however, that the invoices contain "false claims" or "false statements" because the certification of compliance with law is untrue. In particular, Garg contends that Covanta is not in compliance because there are two types of payments that Covanta is legally required to make, but has not done so: (1) so-called "host-benefits" payments; and (2) reclamation revenue sharing.

### 1.     Host Benefit Payments

Under New Jersey law, municipalities such as Rahway that host waste disposal facilities are entitled to receive certain monetary benefits, called host benefits. Prior to 1998, UCUA had an agreement with the city of Rahway to pay those host benefits. Garg alleges, however, that UCUA's obligation to pay those benefits ceased in 1998 with the restructuring. From that point on, Garg claims, Covanta was the entity legally responsible for paying the host benefits.[3] Despite this, UCUA continued to pay the host benefits rather than Covanta. Garg alleges that Covanta is aware that it is required to pay the benefits, but has "remained silent therefore obtaining a monetary windfall."

### 2.     Reclamation Revenue Sharing

Furthermore, under the 1998 restructuring agreements, Covanta is required to reclaim recyclable or reusable materials from the solid waste after processing. The agreements provide that, if Covanta is then able to sell those recyclable or reusable

---

[3] Covanta, for its part, argues that the contracts between Covanta and UCUA specifically addressed the issue of host benefits, requiring only that Covanta pay $850,000 to satisfy part of the host benefits, but that UCUA would continue to pay the remainder.

4

materials, it must share the revenues with UCUA. Garg alleges, however, that since the 1998 restructuring, Covanta has sold thousands of tons of materials reclaimed from solid waste processing, but has not shared the revenues (or negotiated with UCUA to share the revenues) in violation of the terms of the parties' agreement.

**B.**

On August 6, 2010, Garg filed a *qui tam* action on behalf of the United States and the State of New Jersey under both the New Jersey and Federal False Claims Acts ("FCA"). As required by law, Garg's complaint was kept under seal to allow the government time to opt to intervene in the suit. The government declined to intervene, however, and on December 15, 2010, the District Court unsealed the complaint.

Following service of process, Covanta filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). In its motion, Covanta argued that the FCA claim should be dismissed because Garg, among other things, failed to allege that Covanta presented a false claim to the federal government or otherwise defrauded money from the United States.

Garg filed a response opposing the motion. Garg acknowledged that his complaint alleged that Covanta submitted false claims to a *state* agency (*i.e.*, UCUA) rather than to the *federal* government. Nevertheless, Garg contented that he had stated a claim under the FCA because UCUA is a "grantee" of the United States, and thus Covanta's false claims to UCUA fall within the ambit of 31 U.S.C. § 3729(b)(2)(A)(ii). In particular,

5

Garg argued that UCUA is a federal "grantee" by virtue of the fact that it receives a financial benefit from the federal government because of "the deductibility of interest on the tax-exempt bonds it issued to finance" the facility. In other words, Garg asserted that the federal government "contribute[s] the tax revenue [it] otherwise would collect on interest paid to bondholders directly to the UCUA."

On August 4, 2011, the District Court rejected Garg's argument and granted the motion to dismiss the complaint, finding that Garg had failed to state a claim under the federal FCA. Having dismissed Garg's federal cause of action, the District Court declined to exercise supplemental jurisdiction over Garg's claim under the New Jersey False Claims Act. Garg timely appealed.

## II.

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 31 U.S.C § 3732(a), and had supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291, and exercise plenary review over the grant of a motion to dismiss. *Fagin v. Gilmartin*, 432 F.3d 276, 281 (3d Cir. 2005). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted).

The specific issue presented is whether Covanta's alleged false claims and statements to UCUA (a state entity) can support a claim under the federal FCA. The

6

FCA provides, in relevant part, that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States[4] for civil penalties and treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).  The statute defines the term "claim" to mean "any request or demand . . . for money or property [regardless of] whether or not the United States has title to the money or property," that is (1) made to an agent of the United States; *or* (2) "made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest."  *Id*. § 3729(b)(2)(A)(i)-(ii).  In order to base a FCA cause of action on a claim made to a government "contractor, grantee, or other recipient," however, the plaintiff must prove that "the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  *Id*. § 3729(b)(2)(A)(ii)(I)-(II).

As he did before the District Court, Garg asserts before us that the UCUA is a federal "contractor, grantee, or other recipient"  for the purposes of the FCA because it received a substantial economic benefit by issuing tax-exempt bonds in both 1991 and

---

[4] Although a person who violates the FCA is liable "to the United States Government," 31 U.S.C. § 3729(a)(1), the FCA provides that a private person may bring a civil action in

1998 related to the construction of the facility. This argument requires some elaboration.

A tax-exempt bond is a debt instrument often used by state or local governments to raise

money for public works projects. These bonds are attractive to investors because the

interest earned on the bond is not subject to income tax. The bond-issuing government

entity *also benefits*, however, because the attractiveness of tax-exempt bonds means that

the government can issue them at a lower interest rate than non-tax-exempt bonds. *See*

*generally Johnson v. Econ. Dev. Corp. of Cnty. of Oakland*, 241 F.3d 501, 509 (6th Cir.

2001) ("This benefit of the tax-exempt nature of the bonds is generally passed on to the

borrower . . . by way of lower interest rates on the loans."). Garg thus alleges that the

grant of tax-exempt status to UCUA's bonds means that the entity has more money in its

proverbial pocket (thanks to the federal government) than it would if it had to issue non-

tax-exempt bonds at a regular interest rate. This, he argues, makes it a federal grantee.

In support of his argument, Garg cites to a litany of cases (non-FCA cases)

standing generally for the proposition that tax-exemptions are the functional equivalent of

direct cash grants from the government to the benefitted party. *See, e.g., Regan v.*

*Taxation With Representation of Wash.*, 461 U.S. 540, 544 (1983) ("Both tax exemptions

and tax-deductibility are a form of subsidy that is administered through the tax system. A

tax exemption has much the same effect as a cash grant to the organization of the amount

---

the name of the government to enforce the provisions of the statute. 31 U.S.C. §
3730(b)(1). This is known as a *qui tam* action.

of tax it would have to pay on its income."). Garg argues that "Covanta's excessive claims for reimbursement from the UCUA siphon off those savings provided by the federal government." (Appellant's Br. at 21.)

Even granting Garg this point—that UCUA has effectively received a direct financial subsidy from the federal government—his argument still fails. The FCA requires more than fraud against anyone who happens to receive money from the federal government. Were that the case, the scope of the FCA would be enormous. Nearly every adult American receives a "subsidy" from the federal government, be it direct or indirect. In the tax realm alone, every taxpaying American receives some form of exemption or deduction, such as the home mortgage interest deduction, the charitable contributions deduction, or even simply the standard deduction. Just like the tax-exempt bonds, the government's decision to grant these deductions is a matter of grace, and the money saved by these deductions goes straight to the bottom-line of the American taxpayer. Moreover, some of us receive our paychecks from the federal government. That does not mean, however, that every fraud against a government employee or taxpayer supports a claim under the FCA.

Rather, the plain language of the FCA requires that there be some greater nexus between the alleged fraud and the government funds. The FCA does not apply to fraud against *any* federal grantee; it requires that *the specific money or property claimed* must be intended to "be spent or used on the Government's behalf or to advance a Government

program or interest." 31 U.S.C. § 3729(b)(2)(A)(ii). Furthermore, the federal government must also provide at least a portion of the specific "money or property requested" or reimburse the grantee for that specific demand. *Id*. § 3729(b)(2)(A)(ii)(I)-(II). These statutory requirements all drive at the same point—that "the False Claims Act only prohibits fraudulent claims *that cause or would cause economic loss to the government*." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 179 (3d Cir. 2001) (emphasis supplied). "[O]nly actions which have the purpose and effect of causing the government to pay out money are clearly 'claims' within the purpose of the Act." *Id*. at 183 (internal quotation marks omitted).[5]

The case of *United States ex rel. Sanders v. American-Amicable Life Ins. Co. of Texas*, is instructive. 545 F.3d 256 (3d Cir. 2008). In *Sanders*, a plaintiff brought an FCA action against an insurance company. The plaintiff alleged that the defendant targeted young enlisted members of the United States military and signed them up for what was purportedly a "savings plan," but was actually an insurance policy. If a service member elected to participate, the defendant and the service member completed forms allowing for direct payment to the defendant out of the service member's salary. The plaintiff alleged that these forms contained false statements, such as stating that the withdrawal was for a savings plan. These forms ultimately resulted in the United States

---

[5] S*ee also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 304 (3d Cir. 2011) ("The primary purpose of the FCA is to indemnify the government . . . against losses caused by a defendant's fraud.") (internal quotation marks omitted).

10

redirecting part of the service member's salary to the defendant. On defendant's motion, the district court dismissed the action for failure to state a claim.

On appeal, we affirmed. We reiterated that the Act "is only intended to cover instances of fraud that might result in financial loss to the Government." *Id*. at 259 (quoting *Hutchins*, 253 F.3d at 183). The Court found that standard was not met, however, because the direct payments from the government to the defendant were "not made on behalf of the United States, but simply are made from the salary of military personnel as they direct." *Id*. Therefore, we reasoned, "the alleged fraud could not cause the government, as opposed to the defrauded military personnel, to suffer any economic loss." *Id*. Rather, "it was the defrauded military personnel who furnished or made money available to the defendants—and not the federal government—because it was those personnel who decided to participate in the fraudulent 'savings programs.'" *Id*. at 260.

In light of the above, Garg has failed to state a claim under the FCA. Even accepting the facts in his complaint as true, there is no indication that Covanta's allegedly fraudulent claims caused or would cause loss to the government. At best, Garg's complaint established that UCUA had to pay money out of its general operating funds that it should not have had to pay. The fact that some unknown portion of those general operating funds might be tangentially attributable to a tax break from the federal government is irrelevant. The specific money demanded by Covanta was not "to be spent

11

or used on the Government's behalf," nor to advance any government "program or interest."[6] Just like the service members' salary in *Sanders*, the funds were the property of UCUA. This is not a case where the UCUA was administering a specific pool of funds on behalf of the federal government, such as a federally-funded highway project or assistance program. With or without Covanta's alleged fraud, the treasury of the United States would be in the same position. In sum, the federal government does not lose out from Covanta's supposed fraud; it is UCUA and, ultimately, the people of New Jersey.[7]

## III.

For the foregoing reasons, the judgment of the District Court will be affirmed.

---

[6] Garg argues that UCUA was part of a federal "program" because the waste management field is subject to federal regulations and environmental laws. This argument is unpersuasive. The mere fact that the federal government regulates an activity does not transform that activity into a federal "program" for purposes of the FCA.

[7] Covanta makes additional arguments as to why Garg's claim should be dismissed. For example, Covanta argues (1) that Garg failed to allege any specific "false statement" in Covanta's invoices; (2) that the claim fails under the reasoning of the Supreme Court's decision in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008); and (3) that the claim is precluded by the FCA's "tax bar," 31 U.S.C. § 3729(d). Given our disposition, we need not reach these arguments.