# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40807

United States Court of Appeals
Fifth Circuit

**FILED**

July 7, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA, ex rel. RENE SHUPE

Plaintiff - Appellee

v.

CISCO SYSTEMS, INCORPORATED; AVNET, INCORPORATED; CALENCE, L.L.C., also known as Insight Enterprises, Incorporated,

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, CLEMENT, and HIGGINSON, Circuit Judges.

PER CURIAM:

Defendant telecommunication companies file an interlocutory appeal of the denial of a motion to dismiss for failure to state a claim under the False Claims Act, 31 U.S.C. § 3729. For the following reasons, we REVERSE the judgment of the district court and REMAND for further proceedings.

## FACTS AND PROCEEDINGS

Relator Rene Shupe brought a *qui tam* action on behalf of the United States alleging that defendant telecommunication companies violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, while bidding for and being awarded contracts to install and operate communications networks for school districts and libraries throughout South Texas. Partial funding for the

No. 13-40807

installation and operation of these networks came through the Education Rate ("E-Rate") Program, administered by the Universal Service Administrative Company ("USAC") with funds from the Universal Service Fund ("USF").

The USAC and the USF were byproducts of the 1996 Telecommunications Act and the Federal Communications Commission ("FCC") rulemaking that followed.  47 U.S.C. § 254; 47 C.F.R. §§ 54.701, 54.702. USAC is an independent, not-for-profit corporation designated by the FCC as the administrator of the USF.  USAC collects mandatory contributions from telecommunications carriers and distributes some of these funds through the E-Rate Program, which funds telecommunications services, internet access, internal connections, and basic network maintenance in the form of price discounts for eligible services.  47 C.F.R. § 54.504.

To obtain E-Rate funds an applicant must develop a technology plan outlining its technology needs and submit it for approval to the state, the USAC, or an independent entity approved by the FCC or certified by the USAC as qualified to provide approval.  47 C.F.R. § 54.508.  The applicant then files a request for proposals with the USAC to begin a bidding process that is required to be fair and open to competition.  47 C.F.R. § 54.503.  After receiving bids and selecting a service provider, the applicant submits a form to the USAC certifying it has complied with the requirements of the program and requesting discounts for the services.  47 C.F.R. § 54.504.

Shupe, who worked as a project manager for a telecommunications installer, alleges that the defendants tampered with the competitive bidding process, engaged in the "gold-plating" of equipment provided, and substituted E-Rate ineligible products for eligible ones in violation of the FCA by presenting materially false or fraudulent claims for payment or approval by the United States, by using or causing to be used false records or statements regarding equipment to be installed, and by conspiring with each other to

2

defraud the United States. The government investigated Shupe's claims and declined to intervene in the suit.

Defendants filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud claims. The relevant arguments for this appeal were that the FCA causes of action must be dismissed because the USAC is not a government body or funded with government dollars, and the alleged actions taken by defendants do not constitute false claims under the FCA.[1]

The district court denied the motion on May 13, 2013. It rejected the idea that the "funds must be deposited into the Treasury and/or distributed by a government body for there to be a claim under the FCA . . . . The only requirement is that the government provide or reimburse a portion of the money or property that is requested." Because the USAC funds are collected under a mandate from the government and distributed in accordance with FCC regulations, the district court found that the government provided the money. The district court pointed to the "broad definition" of a claim in the FCA and the legislative history of the act to support a "broad application." The district court found the USAC a "grantee, recipient, and agent" of the government.

The defendants asked the court to certify for interlocutory appeal the threshold issue of whether FCA liability extends to requests submitted to the USAC for reimbursement from the USF. The defendants argued that the district court's order created a conflict with *Lyttle v. A T & T Corp.*, No. 2:10-

---

[1] Defendants also argued that Shupe's claims should be dismissed because they were based on publicly disclosed information; that Shupe did not plead his fraud claim with sufficient particularity under Rule 9(b); that Shupe failed to allege his claims against defendants Cisco and Calence with sufficient particularity; and that any causes of action against Calence alleged to have arisen before July 14, 2005, must be dismissed because the company did not exist at that date.

No. 13-40807

1376, 2012 WL 6738149 (W.D. Pa. Dec. 28, 2012) (adopting report and recommendation).  The district court granted the defendants leave to apply for an interlocutory appeal on June 11, 2013.

## STANDARD OF REVIEW

> We review de novo a district court's ruling on a Rule 12(b)(6) motion.  *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.,* 336 F.3d 375, 379 (5th Cir. 2003).  We accept all well-pleaded factual allegations as true, and we interpret the complaint in the light most favorable to the plaintiff.  *Id.*  The plaintiff's factual allegations must support a claim to relief that is plausible on its face and rises above mere speculation.  *United States ex rel. Marcy v. Rowan Cos.,* 520 F.3d 384, 388 (5th Cir. 2008).  In addition, claims brought under the FCA must comply with the particularity requirements of Rule 9(b).  *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997).  Rule 9(b) requires, at a minimum, "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud."  *Id.*; *see also United States ex rel. Rafizadeh v. Cont'l Common, Inc.,* 553 F.3d 869, 872–73 (5th Cir. 2008).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010).

## DISCUSSION

This case decides when the Government "provides any portion of" requested money, as to trigger the protection of the False Claims Act, a statute that shadows every aspect of the administrative state.  31 U.S.C. § 3729(c) (2008).  The FCA's pre-amendment definition of a "claim" requires that the claimant request money that "[t]he United States Government provides any portion of" or "will reimburse . . . any portion of." 31 U.S.C. § 3729(c) (2008).  Our opinion involves an outdated version of the False Claims Act,[2] but the key

---

[2] The FCA was amended in 2009.  The district court analyzed these claims under the prior version of the FCA because the amendments were not made retroactive to conduct before the date of enactment, May 20, 2009.  The prior version of the statute stated that

Any person who--

No. 13-40807

term "provides" is reproduced in the now amended statute, which defines a "claim" as, among other things:

> [A]ny request or demand . . . for money or property and whether or not the United States has title to the money or property, that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . *provides or has provided any portion* of the money or property requested or demanded.

31 U.S.C. § 3729(b)(2)(A)(ii)(I) (2012) (emphasis added). Accordingly, the rule extracted from our opinion will influence the reach of the False Claims Act current and past. We decide that the Government "provides any portion" of the money requested under § 3729(c) when United States Treasury dollars flow to the defrauded entity or if the false claim is submitted to a Government entity.

"The FCA generally permits the Government or a party suing on the Government's behalf to recover for false claims made by the defendants to secure payment by the Government." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003). We have explained that to state a claim under the FCA in our circuit, "a plaintiff must allege: (1) a false statement or

---

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .
>
> 31 U.S.C. § 3729(a) (1994).

5

fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government." *Steury*, 625 F.3d at 267.

The Government's position is that "provides" means "to make available," and that the Government makes money available when it "direct[s] the collection and disbursement of . . . funds." Gov't Br. 2. This broad view of the statutory term is unsupported by the cases interpreting the FCA. To be sure, courts have found that the Government "provides any portion" of the money requested when the Government has given even a drop of treasury money to the defrauded entity. *See, e.g.*, *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 303–04 (4th Cir. 2009) ("Textually, therefore, a claim made to a grantee of U.S. money is not defined by the amount of money that the U.S. government paid directly to the claimant. So long as '*any portion*' of the claim is or will be funded by U.S. money *given to the grantee*, the full claim satisfies the definition of claim."); *United States ex rel. Shank v. Lewis Enters., Inc.*, No. 04-CV-4105–JPG, 2006 WL 1207005, at *7 (S.D. Ill May, 3, 2006) (holding that Abandoned Mine Reclamation Fund ("AMRF") was covered by FCA because "defendants do not even argue that all the money in the AMRF is private, they just say that money from the coal mines is the 'primary source[ ]' of funding. Implicitly, then, defendants admit some portion of the funds come from the government.").

Courts have also identified entities that do not receive Government funds, but nevertheless are covered by the FCA because of their status as Government entities. *See e.g.*, *United States v. McNinch*, 356 U.S. 595, 598 (1958) (holding that the Federal Housing Administration is covered by the FCA because "[t]he FHA is an unincorporated agency in the Executive Department created by the President pursuant to congressional authorization. Its head,

6

the Federal Housing Commissioner, is appointed by the President with the Senate's consent, and the powers of the agency are vested in him.  The agency is responsible for the administration of a number of federal housing programs and operates with funds originally appropriated by Congress.  In short, the FHA is about as much a part of the Government as any agency can be."); *United States v. Mackby*, 261 F.3d 821, 824, 826 (9th Cir. 2009) (noting that it is undisputed that a claim for Medicare payment triggers the FCA); *United States v. Hicks*, No. 04-4189-GPM, 2008 WL 1990436, at \*3 (S.D. Ill. May 5, 2008) (holding that false claims may be made against United States Postal Service and noting that "[a]lthough the Postal Service is a 'self-funding' entity, this is not to say that it is divorced from the United States Treasury.  The Postal Service is self-funding only in the sense that Congress has appropriated to it all of the Postal Service's own revenues.  It nevertheless is 'operated as a basic and fundamental service provided to the people by the Government of the United States.'" (quoting *Baker v. Runyon*, 114 F.3d 668, 672 (7th Cir. 1997)).

Importantly, however, courts have identified programs that do not trigger FCA protection because they do not receive federal funds *and* they have too tenuous of a relationship to the Government to be considered a Government entity.  *See, e.g.*, *United States ex rel. Sanders v. Am.-Amicable Life Insur. Co. of Tex.*, 545 F.3d 256, 259 (3d Cir. 2008); *United States ex rel. Totten*, 380 F.3d 488, 493 (D.C. Cir. 2004) (holding that claim against Amtrak not presented to the Government and noting that "[t]he word 'provides' in Section 3729(c), when appropriately limited to the present tense, squares neatly with a presentment requirement.  False Claims Act liability will attach if the Government provides the funds to the grantee upon presentment of a claim to the Government."); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184 (3d Cir. 2001) (holding that submission of fraudulent legal bills for approval to the United States Bankruptcy Court does not violate the False Claims Act because "the

submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act"); *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) (holding that United States involvement in negotiations that led to the stipulation under which a private entity agreed to put money into a fund for environmental clean-up costs did not trigger the FCA because "[n]one of the money in the private Vertac trust fund, long since depleted, was provided by the United States Government.  No federal funds were ever intermingled with that fund.  The United States had no access to the trust fund, nor did it have any control over its disbursement, which was overseen by the State of Arkansas.  Moreover, no money disbursed from the private fund was ever reimbursed by the federal government"); *see also Garg v. Covanta Holding Corp.*, 478 F. App'x 736, 741 (3d Cir. 2012) ("At best, Garg's complaint established that UCUA had to pay money out of its general operating funds that it should not have had to pay.  The fact that some unknown portion of those general operating funds might be tangentially attributable to a tax break from the federal government is irrelevant. . . .  With or without Covanta's alleged fraud, the treasury of the United States would be in the same position.  In sum, the federal government does not lose out from Covanta's supposed fraud."); *United States ex rel. Fellhoelter v. Valley Milk Products, L.L.C.*, 617 F. Supp. 2d 723, 731 (E.D. Tenn. 2008) ("The alleged 'claims' in this case do not reach or threaten to reach government funds. The money Valley Milk has allegedly received by paying less than the blend price came from the Settlement Fund, money provided solely by milk producers. . . . The court concludes that these alleged frauds are not claims against the government fisc as required by the FCA.").

This last set of cases reveals that courts have limited the FCA's application to "instances of fraud that might result in financial loss to the

Government." *Sanders*, 545 F.3d at 259 (internal quotations omitted); *see also Costner*, 153 F.3d at 677 ("Essentially, then, only those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered 'claims' within the meaning of the FCA."). The money in the USF is untraceable to the United States Treasury. Accordingly, although the United States may have a regulatory interest in the E-Rate program, the United States does not have a financial stake in its fraudulent losses. That recovery for an unquantifiable regulatory interest falls outside of the scope of FCA protection is further supported by the FCA's damages provision, which provides a penalty of "3 times the *amount of damages which the Government sustains*." 31 U.S.C. § 3729(a) (2008) (emphasis added).

Acknowledging this, the Government urges that the FCA applies because of the extent of the FCC's control over the E-Rate program. This control-based test fails to distinguish *Hutchins*, in which the Third Circuit addressed "fraudulent legal bills for approval to the United States Bankruptcy Court" and rejected the argument that "even if no claim were made against United States Treasury money in connection with the law firm's inflated legal bills, the submission of these bills for approval by the Bankruptcy Court violates the False Claims Act." 253 F.3d at 180, 183. That the bankruptcy court could approve a portion or all of these claims did not matter because "the Act is only intended to cover instances of fraud 'that might result in financial loss to the Government.'" *Id.* at 183 (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)). Moreover, the Government's involvement in creating the privately capitalized clean-up fund in *Costner* was insufficient to sustain a claim under the FCA because "[a]ny allegedly false claims for

9

payment made by defendants to the Vertac trust fund had no nexus to the United States." 153 F.3d at 677.

Courts differentiate between entities that are the Government and those that are not by looking at their statutes rather than the extent of Government supervision. In *Totten*, for example, then-Judge Roberts distinguished *Rainwater v. United States*, 356 U.S. 590 (1958), which held that the Commodity Credit Corporation was part of the Government for FCA purposes. *Totten* explained, "the statute in that case expressly provided that the Corporation was "an 'agency and instrumentality of the United States.'" *Totten*, 380 F.3d at 492. Next, then-Judge Roberts distinguished Amtrak's statute: "Amtrak's statute, of course, gives Amtrak the exact opposite status: Attempts to analogize the other facts in *Rainwater*—that all of the Commodity Credit Corporation's employees were employees of the U.S. Department of Agriculture, and that the entire budget of the Corporation came from the federal treasury—are similarly fruitless." *Totten*, 380 F.3d at 492 (internal citations omitted).

The Postal Service's statute similarly explains: "The United States Postal Service shall be operated as a basic and fundamental service provided to the people *by the Government of the United States*, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a) (emphasis added). And the Supreme Court recognized that "The FHA is *an unincorporated agency in the Executive Department* created by the President pursuant to congressional authorization. . . . The agency is responsible for the administration of a number of federal housing programs and operates with funds originally appropriated by Congress." *McNinch*, 356 U.S. at 598 (emphasis added).

Illustratively, in another FCA case the Government did "not challenge the defendants' contention that the FCA, prior to the 2009 amendments, has

no application to Fannie Mae or Freddie Mac." Brief for United States at 2 n.2, *United States ex rel. Adams v. Wells Fargo Bank Nat'l Ass'n*, No. 2:11–cv–00535–RCJ–PAL, 2013 WL 6506732 (D. Nev. Dec. 11, 2013). Fannie Mae's enacting statute, for example, explains:

> The purposes of this title include the partition of the Federal National Mortgage Association as heretofore existing into two separate and distinct corporations. . . . One of such corporations, to be known as Federal National Mortgage Association, will be a Government-sponsored private corporation, will retain the assets and liabilities of the previously existing corporation accounted for under section 1719 of this title, and will continue to operate the secondary market operations authorized by such section 1719.

12 U.S.C. § 1716b. The same statute explains that the other corporation, by contrast, will "be known as Government National Mortgage Association, [and] *will remain in the Government.*" *Id.* (emphasis added).

Although we have recognized in other contexts that "the Congressional Budget Office has treated universal service fund contributions as federal revenues," *Tex. Office of Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 427 (5th Cir. 1999), courts have explained that the program is independent from the Government:

> While we recognize that the FCC does hold substantial power over the fund indirectly, essentially by overseeing USAC, we also recognize that it has no ability to control the USF through direct seizure or discretionary spending. We hold that USAC, which, as administrator of the USF, has discretion over if, when, and how it disburses universal service funds to beneficiaries, holds dominion over the USF.

*In re Incomnet*, 463 F.3d 1064, 1071 (9th Cir. 2006). Moreover, "[w]hen the FCC created NECA [USAC's sole shareholder and therefore the program's administrator], it made clear that NECA acted exclusively as an agent for its members and had no authority to perform any adjudicatory or governmental functions." *Farmers Telephone Co., Inc. v. FCC*, 184 F.3d 1241, 1250 (10th Cir. 1999).

No. 13-40807

At least one lower court that has closely considered the question for a similar fund has rejected the same arguments that Shupe and the United States now advance. *Lyttle v. A T & T Corp.*, No. 2:10-1367, 2012 WL 6738242, *15-21 (W.D. Pa. Nov. 14, 2012).[3] A relator there brought a false claims case against a telephone company on allegations that the company fraudulently certified compliance with FCC regulations while seeking reimbursement from a fund created to subsidize a service to help deaf or speech-impaired persons communicate via phone. *Id.* at *1-10. The fund for the services was established through congressional and FCC action and initially administered by the same National Exchange Carrier Association, Inc., that oversees the E-Rate fund.

> The United States argued that
>
> 1) the Administrator is an agent of the United States for purposes of reimbursing money from the Fund (even if not for other purposes); [and] 2) the money is "provided by" the United States because it is collected based on Congressional levy and because it is a line item in the federal budget . . . .

*Id.* at *13. The defendants responded that "1) the Administrator is not an 'agent' of the FCC because it had no authority to bind the FCC by its actions; [and] 2) the contractor provision does not apply because the United States does not 'provide' the funds . . . ." *Id.* at *14.

The magistrate judge rejected the argument that the United States "provides" any portion of the money in the funds. *Id.* at *18-21. Any submission of false claims did not "cause financial loss to the government." *Id.* at *20. Nor could the Government cite "a case in which a court has held that, although money was put into a fund and taken out of it by private parties, the Government nevertheless 'provided' the funds because it required that such

---

[3] The Magistrate Judge analyzed the claims under the amended version of the FCA, which arguably broadens the basis for claim liability from the version we consider today.

money be paid or because the program is included in the federal budget." *Id.* at \*21. The district court adopted the magistrate judge's recommendation as its opinion. *Lyttle*, 2012 WL 6738149, at \*1.

Like the court concluded in *Lyttle*, we conclude that the Government did not provide the funds to the USF to subject claims to it to FCA liability. The text of the relevant version of § 3729(a) speaks of making false claims to "the United States Government," seeking to get false claims paid "by the Government," or conspiring "to defraud the Government." The Supreme Court has been clear that § 3729(c)'s definition of claim does not expand FCA liability over acts directed towards parties that are not "the Government." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 669-70 (2008). Although USAC came about through the actions of Congress and the FCC, and the FCC retains some oversight and regulation, it is explicitly a private corporation owned by an industry trade group. The defendants point out that Congress "*explicitly rejected* the FCC's request" to directly administer the E-Rate program. While the United States now argues that a decision that USAC and the USF are not susceptible to FCA liability would lead to the FCC administering the program directly and therefore be "contrary to efficient administration," decisions about the costs and benefits of government versus private administration are for Congress to make, not this court. The money in the USF is provided by private telecommunication providers because of a mandatory contribution scheme established by the FCC and Congress. Congress has not declared this a tax, and the origination of the bill in the Senate undermines the argument that it is one. The executive has admitted that including the USF in budget documents is for the purpose of being "comprehensive," not a claim that these are clearly federal funds. The district court in *Lyttle* rejected the identical arguments raised here because the government could not defend its position that there was any "economic loss to

the United States Treasury," the original purpose of the statute.  2012 WL 6738242, at *21.   The logic of the Supreme Court's unanimous opinion in *Allison Engine* rejects a broad reading of the FCA (because of its language or any reliance on its legislative history) and supports the approach taken in *Totten.* 553 U.S. at 667-68.  If Congress had wanted the FCA to apply to the USAC and the USF, it could have made it clear in § 3729 or administered these funds through a governmental entity.

Accordingly, that the FCC maintains regulatory supervision over the E-Rate program does not affect the Congress' decision, embodied in the program's independent structure, to externalize the cost of administering the program to a private entity.   47 C.F.R. § 54.701(a).   Because there are no federal funds involved in the program, and USAC is not itself a government entity, we agree that the Government does not "provide[] any portion of" the requested money under the FCA. § 3729(c) (2008).

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings.