In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 22-1515

UNITED STATES OF AMERICA ex rel. TODD HEATH,

*Relator-Appellant,*

*v.*

WISCONSIN BELL, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:08-cv-00724-LA — **Lynn Adelman**, *Judge.*

---

ARGUED FEBRUARY 9, 2023 — DECIDED AUGUST 2, 2023

AMENDED ON PETITION FOR REHEARING JANUARY 16, 2024

---

Before EASTERBROOK, HAMILTON, and LEE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Congress established the Schools and Libraries Universal Service Support program to keep telecommunications services affordable for schools and libraries in rural and economically disadvantaged areas. The program subsidizes services and requires providers to charge these customers rates less than or equal to the lowest rates they

charge to similarly situated customers. Relator Todd Heath brought this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 et seq., alleging that defendant Wisconsin Bell charged schools and libraries more than was allowed under the program, causing the federal government to pay more than it should have. The district court granted summary judgment in favor of Wisconsin Bell.

Heath's briefing and evidence focused more on which party bore the burden of proving violations than on identifying specific violations in his voluminous exhibits and lengthy expert report. We understand how the district court could look at this record and rule in Wisconsin Bell's favor. Nevertheless, Heath identified enough specific evidence of discriminatory pricing to allow a reasonable jury to find that Wisconsin Bell, acting with the required *scienter*, charged specific schools and libraries more than it charged similarly situated customers. Accordingly, we reverse the judgment of the district court and remand the case for trial. We are issuing this amended opinion upon consideration of Wisconsin Bell's petition for rehearing and denial of its petition for rehearing en banc.

I.  *Factual and Procedural Background*

In 1996, Congress created the E-rate program (known more formally as the Schools and Libraries Universal Service Support program) to help schools and libraries across the country afford telecommunications and information services. See Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. As part of the program, schools and libraries receive federal subsidies for 20 to 90 percent of charges on a sliding scale that depends on the income level in the surrounding community and whether the community is urban or rural.

47 C.F.R. § 54.505(b) & (c). Under Federal Communications Commission regulations implementing the E-rate program, service providers must follow what is known as the "lowest-corresponding-price" rule and offer schools and libraries "the lowest price … charge[d] to non-residential customers who are similarly situated." 47 C.F.R. § 54.500.

The regulations do not impose a specific formula to determine when a school or library is similarly situated to a particular non-residential customer for purposes of comparing prices. Yet the FCC has long made clear that service providers cannot escape their obligation to provide the lowest price charged to similarly situated customers simply "by arguing that none of their non-residential customers are identically situated to a school or library." *In re Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd. 8776, ¶ 488 (1997) ("First Order"), adopted by FCC at Universal Service, 62 Fed. Reg. 32862 §§ 290–97 (June 17, 1997). Differences in rates between similarly situated customers are acceptable only when "providers can show that they face demonstrably and significantly higher costs" in serving the school or library due to differences between the customers "that clearly and significantly affect the cost of service, including mileage from switching facility[,] … length of contract," "traffic volumes," and "any other factor that the state public service commission has recognized." *Id.*, ¶¶ 488–89.

Wisconsin Bell has provided services to at least hundreds of eligible schools and libraries. Those customers have submitted claims to the FCC requesting reimbursement for Wisconsin Bell's services, and Wisconsin Bell has submitted reimbursement claims directly for eligible services provided to E-rate program customers.

As the E-rate program began, Wisconsin Bell's parent company helped develop industry proposals about its implementation. Wisconsin Bell admitted during this lawsuit that it had been aware of the lowest-corresponding-price rule from the rule's inception in the 1990s. In 2001, a future leader of Wisconsin Bell's legal and regulatory group recommended to an industry trade group representing Wisconsin Bell that the group withdraw its request to the FCC for clarification of the lowest-corresponding-price rule. He advised in an email that the rule "is a non-issue. We support not raising [it] …. Let a sleeping dog lie; it needs to keep a low profile unless it starts to cause problems for us."

Despite being aware of the E-rate program and its pricing rule, Wisconsin Bell did not train its sales representatives on the rule, nor did it put into place any mechanism to comply with it, until 2009. Wisconsin Bell admits there was no difference between the way it treated pricing contracts with schools and libraries versus with private businesses or any other customers. By Wisconsin Bell's own testimony, these practices included instructing sales representatives to offer the highest prices "whenever possible." Employees responsible for training Wisconsin Bell's salesforce testified that they had never heard of the lowest-corresponding-price rule before 2009.

In 2009, Wisconsin Bell developed a plan for complying with the rule. It did so after its parent company settled a Department of Justice and FCC investigation of its E-rate practices in Indiana through a monetary payment and a compliance agreement. Wisconsin Bell admits that, beginning in 2009, it used "interim policies and processes for at least two years" and that these policies did not reach a "steady state" until 2011. Wisconsin Bell also admits that it considered the

prices charged to similarly situated customers "as just one factor among many in deciding what price" to charge an E-rate customer even after 2009.

Under the False Claims Act, a private citizen may sue as a "relator" in a *qui tam* action to recover funds fraudulently obtained from the United States government. 31 U.S.C. § 3729(a)(1)(A). Such suits are brought in the name of the government and for its benefit, but a successful relator may recover a significant portion of any recovery. See generally *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 143 S. Ct. 1720, 1726–28 (2023) (summarizing *qui tam* litigation under the Act); *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 774–77 (2000) (holding that *qui tam* relator has Article III standing and noting that *qui tam* actions appear to have originated in England in 13th century, had long tradition in both England and the American Colonies, and were "prevalent" immediately before and after framing of Constitution).

Todd Heath filed this *qui tam* action under the False Claims Act in 2008. He alleged that Wisconsin Bell submitted false claims and caused others to submit false claims for more money than was allowed to be charged, as well as expressly and implicitly false certifications of compliance with E-rate program rules. In 2011, the federal government decided not to intervene. The district court then granted Wisconsin Bell's motion to dismiss for lack of subject matter jurisdiction. This court reversed. *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 692 (7th Cir. 2014). Heath filed his Second Amended Complaint in 2015. The parties engaged in discovery, and Heath hired an expert to analyze the extensive and detailed pricing data. Wisconsin Bell moved for summary

judgment, and the district court granted that motion. *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 593 F. Supp. 3d 855, 861–62 (E.D. Wis. 2022). This appeal followed.

II. *Analysis*

A company violates the False Claims Act if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" that is material to the government's decision on the use of federal funds. 31 U.S.C. § 3729(a)(1)(A); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (§ 3729(a)(1)(A) requires falsity regarding material issue). Thus, a False Claims Act case requires proof of falsity, knowledge, materiality (meaning whether the alleged misrepresentations had the natural tendency to influence the payment or receipt of funds), and the involvement of federal funds. The district court granted summary judgment for Wisconsin Bell, finding that Heath did not show a genuine dispute as to a material fact concerning either falsity or knowledge. In its summary judgment ruling, the district court did not reach the issues of materiality or whether the E-rate program involves federal funds, though the court had addressed these issues in prior orders.

Summary judgment is proper when there is no genuine dispute about any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We review de novo the district court's grant of summary judgment. E.g., *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022). We give Heath the benefit of conflicting evidence and draw reasonable inferences from the evidence in his favor. *Id.* The question is whether he offered evidence raising "some genuine issue for trial such that a reasonable jury could return a verdict" agreeing with him that Wisconsin Bell knowingly

caused the submission of claims that overcharged schools or libraries and that those overcharges were material to a payment decision involving federal funds. *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (quotation omitted). We address four issues in turn: (A) falsity; (B) knowledge or *scienter*; (C) materiality; and (D) involvement of federal funds.

A. *Falsity*

The district court found that Heath failed to show falsity because he did not "show that any customers that were charged the lower rates were similarly situated to those who were charged a higher rate." *Heath*, 593 F. Supp. 3d at 860. Heath's briefing and the district court's opinion focused primarily on which party bore the burden of identifying similarly situated customers as proper comparators to determine compliance with E-rate price rules.

In the district court's eyes, Heath waived the crucial argument that the customers he analyzed who were charged different prices were in fact similarly situated. *Id.* at 859 & n.1. The court wrote that Heath's expert witness, James Webber, did not "describe what factors" he used to conclude that customers were similarly situated and thus proper comparators for rates charged. *Id.* at 859 n.1. The court acknowledged that Webber compared at least one school directly paying "a rate more than three times higher than the rate charged to" another customer but said that this comparison did not "attempt to show that the two customers were similarly situated." *Id.* at 860.

Heath's heavy focus on persuading the district court that Wisconsin Bell should have had the burden to identify similarly situated customers seems to have distracted from the

fact that he *did* muster quite specific evidence showing that certain schools and libraries were charged more than certain non-residential customers and that those pairs of customers appeared to be similarly situated. See Pl. Br. in Opp'n to Summ. J., at 14, Dkt. 311; Decl. of James D. Webber ¶ 7, Dkt. 308. Heath's evidence also showed that his expert did in fact take into account key factors, including contract duration, urban versus rural location, size of contracting entity, and distance from the provider. There is no complete list of which factors may be considered in deciding whether two customers are similarly situated. But Heath offered evidence that his expert considered those that the parties continue to identify in their briefing as relevant. Expert Report of James D. Webber, at 76–81, Dkt. 279, Ex. 111.[1]

We do not doubt that Heath could have better presented his evidence to walk the district judge through the parts of his expert's report that directly compared customers who all known factors indicated were similarly situated. But critiquing advocacy is not our role. For our purposes, the critical points are that this specific evidence was in the expert report and that Heath's briefing spelled it out with sufficient explanation and argument. For example, Heath's brief opposing the motion for summary judgment and his statement of facts included a chart showing wide-ranging pricing for the same

---

[1] One chart was reproduced in briefing before this court that was not filed under seal. Additional evidence of comparisons indicating that differently charged customers appear similarly situated is in the district court record but still under seal. On remand it will be appropriate for the district court to ask whether any portions of the evidence, especially prices and contract terms from so many years ago, should be kept under seal any longer.

circuit product. All customers in the chart were in Wisconsin, and at least some were identified as being in the same city. The chart also displayed each contract's duration and the number of products purchased by each customer. Thus, the chart accounted for the key factors determining whether customers are similarly situated.

The differences in pricing are not disputed (or even explained) by Wisconsin Bell, at least so far. For example, one school in Milwaukee, Bruce Guadalupe Community School, paid $1,110 per month for each of two telecommunications circuits on a month-to-month contract. At the same time, another school in Milwaukee, Messmer High School, paid $743 per month for one circuit, also on a month-to-month contract. Meanwhile, the Lake Geneva-Genoa City School District paid $459 per month for one circuit on a 36-month contract while a private business, Automatic Data, paid only $337 per month for one circuit on a contract of the same length. These comparisons and the fact that Wisconsin Bell did not dispute them or provide any explanation for the price differences present genuine factual disputes over whether Wisconsin Bell was charging schools and libraries the lowest price it was charging similarly situated customers.[2]

---

[2] As discussed at oral argument and in supplemental submissions by the parties, Heath could have used statistical evidence to support his claim. We have recognized that statistical analyses may be used to support False Claims Act cases. See *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 713–14 (7th Cir. 2014) (vacating jury verdict where there was no "evidence—statistical or otherwise—from which the jury could determine (at least approximately) how many of [the] documents contained false certifications"). Here, even without statistics, Heath has done enough to proceed past summary judgment because he

This same chart was reproduced in Webber's declaration, filed under seal. Though we do not go into detail here about the contents of that sealed document, it makes clear that the $1,110 monthly price charged to Bruce Guadalupe Community School was higher than would be expected from looking at prices charged to other customers of the same circuit that same year. Further, Webber showed that in 2009 Wisconsin Bell entered a new contract with that school and dropped the price significantly.

In another chart, Webber calculated the overcharges to schools and libraries per year based on the lowest rate charged for the same service to a customer in Wisconsin. Webber went on to adjust this basic calculation based on the factors that might justify different prices: contract duration, urban versus rural location, customer size (in terms of number of employees), and distance between the customer and the provider. Even when Webber limited his overcharges calculation by directly comparing schools and libraries only to customers who shared these factors, the schools and libraries were still charged more every single year. Expert Report of James D. Webber, at 81, Dkt. 279, Ex. 111.

Alongside this evidence was Wisconsin Bell's admission that it had no methods or procedures in place to comply specifically with the E-rate program prior to 2009, as well as the email sent on behalf of a trade organization representing Wisconsin Bell suggesting that the company withdraw a petition to the government asking for clarification on the E-rate program and instead "let a sleeping dog lie; [the rule] needs to

---

identified customers who appear similarly situated yet were charged different rates in apparent violation of the lowest-corresponding-price rule.

keep a low profile unless it starts to cause problems for us." Webber's specific comparisons against this factual backdrop were enough to raise a genuine dispute about the central issue of whether schools or libraries were charged more than similarly situated non-residential customers. In response, Wisconsin Bell provided no evidence showing that these specifically compared customers were either not similarly situated or that cost differences justified the pricing.[3]

Rather than explain why the apparent price differences were acceptable, Wisconsin Bell argued generally that Heath never showed that any two customers were similarly situated. But Wisconsin Bell indisputably had schools and libraries eligible for the program as customers, including the schools identified in the chart discussed above. The FCC's guidance makes clear that providers cannot escape the E-rate program pricing rules by simply arguing that *no* customers are similarly situated. First Order, § 488. Wisconsin Bell's assertion that Heath never identified any similarly situated customers

---

[3] Wisconsin Bell argues that it complied with the E-rate program rules by complying with separate federal and state rules more generally prohibiting discriminatory pricing. See 47 U.S.C. § 202(a); Wis. Stat. § 196.60(1)(a). The theory is not persuasive. The federal nondiscrimination rule prohibits "unjust or unreasonable discrimination in charges," and the state rule uses similar language. Both rules apply a different standard than the E-rate program created for school and library pricing. In fact, the FCC says that schools and libraries are "eligible for preferential rates … notwithstanding the nondiscrimination requirements of section 202(a)." First Order, ¶ 483. Even if Wisconsin Bell could show absolute compliance with the nondiscrimination rules, that showing would not necessarily defeat a claim that schools and libraries were overcharged in violation of the E-rate program requirements.

throughout the lengthy expert analysis comes very close to that impermissible escape.

In sum, Heath used the information provided by Wisconsin Bell in discovery to identify seemingly similarly situated customers. He identified individual schools that, when compared against each other, look like they were charged different rates under comparable contract terms for the same products in the same geographic areas. Wisconsin Bell made no attempt to show how those identified customers were not similarly situated or why the schools and libraries were charged apparently higher prices for similar services, let alone to establish those points beyond reasonable dispute, as would be needed to resolve the issue as a matter of law on a motion for summary judgment. Heath offered evidence sufficient to show falsity as to whether Wisconsin Bell impermissibly charged schools and libraries more than it charged similarly situated customers.[4]

B. *Scienter*

The False Claims Act imposes liability for the *knowing* submission of false claims. The Act provides that a person acts "knowingly" if that person "with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). To show the defendant

---

[4] We refer in this opinion to a few specific examples of Heath identifying similarly situated customers. As the case progresses on remand, Heath should not be limited to proving overcharges for only those customers identified in this opinion.

acted knowingly, the plaintiff is not required to prove "specific intent to defraud." *Id.*

The district court, applying circuit precedent that has since been reversed by the Supreme Court, ruled that even if Heath had offered evidence of falsity, his claims would nonetheless fail on the knowledge element. *Heath*, 593 F. Supp. 3d at 860. The district court said that Wisconsin Bell's interpretation of the lowest-corresponding-price rule—that it could use "cost-based factors when determining which customers are similarly situated and to allow it to offer different rates to different E-rate customers"—was "objectively reasonable" and "consistent with the plain language of the [lowest-corresponding-price] rule and the FCC guidance." *Id.* at 861. The district court was following *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 463–65 (7th Cir. 2021), which held that knowledge under the False Claims Act could not be shown if the defendant's interpretation of the regulation was objectively reasonable and no authoritative guidance warned against that interpretation, regardless of evidence of subjective intent and actual knowledge.

After oral argument in this appeal, the Supreme Court issued its decision in *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739 (2023), vacating this court's judgment. The Supreme Court made clear that the knowledge analysis under the False Claims Act "refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Id.* at 749.

Under this reasoning, Wisconsin Bell's own conduct at least raises a genuine question as to whether it acted in reckless disregard of the truth or falsity of the claims submitted. "Reckless disregard" encompasses "defendants who are

conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.* at 751; see also *King-Vassel*, 728 F.3d at 713 ("a person acts with reckless disregard 'when the actor knows or has reason to know of facts that would lead a reasonable person to realize' that harm is the likely result of the relevant act," quoting *Black's Law Dictionary* 540–41 (9th ed. 2009)). A relator may of course rely on circumstantial evidence to prove *scienter* under the False Claims Act. *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008).

Heath has offered evidence that could support a reasonable inference of *scienter* here. Wisconsin Bell admits that it knew of the lowest-corresponding-price rule at the rule's inception. Heath has offered evidence that Wisconsin Bell for many years did not have any methods or processes in place even to determine whether it was complying with the law in pricing services for schools and libraries. Not until 2009, when Wisconsin Bell's parent company signed a compliance agreement after a Department of Justice and FCC investigation in another state, did Wisconsin Bell even inform its employees responsible for negotiating rates with schools and libraries that the lowest-corresponding-price rule existed.

Wisconsin Bell also did not have a system for identifying similarly situated customers within the meaning of the E-rate program rules. Wisconsin Bell does not present any compelling explanation for how it could have known whether the prices it was charging those schools and libraries were consistent with the lowest-corresponding-price rule without the ability to know what the lowest corresponding price was.[5]

---

[5] Wisconsin Bell asserts that even before 2009, it instructed employees responsible for pricing to "consider" what "similarly situated customers"

Drawing inferences in Heath's favor, this behavior indicates at least a genuine question as to whether Wisconsin Bell was acting with reckless disregard of the possibility that it was charging E-rate eligible customers in violation of the lowest-corresponding-price rule and thus submitting false claims and causing others to submit false claims.

The evidence of knowledge after Wisconsin Bell implemented its new policies in 2009 may not be as strong but is still sufficient to reach a jury. Heath's expert reported that estimated overcharges increased from 2008 through 2010 before dropping in 2011, even controlling for differences in customers based on contract duration, rural versus urban location, size of customer, and distance from Wisconsin Bell facilities. This evidence is enough to create a genuine issue as to whether Wisconsin Bell continued acting with reckless disregard for the lowest-corresponding-price rule during its rollout of new compliance procedures. With this evidence, a jury could reasonably infer that Wisconsin Bell acted in reckless disregard of whether the prices it was charging schools and libraries were above the prices charged to similarly situated customers. We therefore cannot affirm summary judgment on the issue of *scienter*.

C. *Materiality*

The district court's decision on summary judgment did not reach the issue of materiality, but Wisconsin Bell asks us to affirm on that alternative basis, which was briefed in the

---

were charged. But this vague instruction to "consider" other customers falls short of the requirements of the E-rate program, which were to ensure that schools and libraries would in fact be charged the *lowest* price charged to a similarly situated customer.

district court. Wisconsin Bell argues that Heath failed to demonstrate a factual dispute over whether the alleged falsity of the claims was material to the government's payment decisions for two reasons. The first is that the lowest-corresponding-price rule is not expressly identified as a condition of payment on relevant forms. The second is that the government has continued to pay E-rate claims in Wisconsin while aware of Heath's allegations. We reject both arguments.

First, the False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality analysis is not controlled by whether the government expressly designated the legal requirement at issue as a condition of payment. "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181. A defendant can be liable for "submit[ting] a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose … noncompliance with a statutory, regulatory, or contractual requirement … if the omission renders those representations misleading." *Id.*

Wisconsin Bell argues that materiality is not satisfied because "the government has never required E-rate program participants to expressly certify their compliance with the [lowest-corresponding-price] rule." Relying on *Escobar*, Wisconsin Bell asserts that this fact shows a lack of materiality. But *Escobar* taught clearly that "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." 579

U.S. at 194. *Escobar* warned against an expansive view of the False Claims Act that would impose liability, for example, where a company providing health services failed to comply with a random hypothetical provision of the U.S. Code requiring all government contractors to use American-made staplers. *Id.* at 195–96. That example involved compliance with a requirement not directly related to the claim or the underlying services.

Here, the subsidies for school and library communications costs are tied directly to the lowest-corresponding-price rule. *Escobar* does not suggest that violating such a relevant requirement of a government subsidy program should be found immaterial under the False Claims Act. The government created the E-rate program to keep these services affordable for schools and libraries. The lowest-corresponding-price rule is one mechanism to accomplish that purpose and to control the cost of government subsidies. Express certification of compliance should not have been necessary for a provider to understand that the rule is important to the program's functioning and thus that noncompliance could influence reimbursement decisions. A jury might also reasonably infer that the importance of this rule was in fact understood by those who wanted to leave it undisturbed as a "sleeping dog," anticipating that if this dog woke up, it might bark or even bite.

Second, Wisconsin Bell argues that "the company's supposed misstatements made no difference to any payment decision" because E-rate program payments have been "consistently made … despite the government's … full awareness of Heath's allegations." Wisconsin Bell does not come close to mustering the kind of evidence that would defeat a False Claims Act case at summary judgment on such a theory

regarding materiality. The argument seeks to erase the difference between allegations and conclusive proof. None of Wisconsin Bell's evidence suggests that the government has routinely paid claims "in full despite actual knowledge" that E-rate pricing rules were violated. See *Escobar*, 579 U.S. at 195 (noting that such evidence would be "strong evidence that the requirements are not material").

The government's knowledge of a pending lawsuit making allegations simply does not indicate actual knowledge of actual violations. The entire purpose of the E-rate program is to keep costs low. Draining the program's resources through higher prices for services affects the government's ability to subsidize services for schools and libraries across the country. It is reasonable to infer that if the government knew of actual overcharges, it would not approve claims. At the very least, a genuine question of material fact exists on this issue. It does not offer an alternative basis for affirming summary judgment.

D.  *Government Funds*

As another ground for affirming summary judgment, Wisconsin Bell contends that any allegedly fraudulent claims for payment of subsidies under the E-Rate program do not even amount to "claims" under the False Claims Act. Wisconsin Bell's theory is that private parties, not the federal government, contribute the money that funds the E-Rate program by paying annual fees to a private entity, the Universal Service Administrative Company (USAC), that administers the program. Wisconsin Bell argues that the private nature of this funding structure means that the government does not "provide" the program's funds within the meaning of the False Claims Act and is not hurt by fraud in the program. The Fifth

Circuit agreed with this argument and affirmed dismissal of a similar False Claims Act case alleging fraud in the E-Rate program in *United States ex rel. Shupe v. Cisco Systems, Inc.*, 759 F.3d 379 (5th Cir. 2014), though apparently without the benefit of critical evidence and legal arguments available to us in this case.

Earlier in this case, Judge Adelman rejected Wisconsin Bell's argument and *Shupe*'s holding in a persuasive opinion denying a motion to dismiss. *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 111 F. Supp. 3d 923, 926–28 (E.D. Wis. 2015). We agree with his reasoning, which is consistent with the statutory language and the broader sweep of case law under the False Claims Act, particularly as applied to a variety of specialized government funds and funding mechanisms. E.g., *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019) (citing *Heath* with approval and holding that allegedly fraudulent loan requests submitted to any of twelve Federal Reserve Banks were "claims" under False Claims Act). We therefore respectfully decline to follow *Shupe* on this issue.[6]

To explain our reasoning in detail, we start by parsing the definitions of a "claim" under the Act both before and after a clarifying amendment of the Act in 2009. We then trace three

---

[6] This amended opinion has been circulated to all judges of this court in regular active service considering Wisconsin Bell's petition for rehearing en banc and Heath's answer to it. No judge in regular active service requested a vote on rehearing en banc, including the question whether to disagree with *Shupe* on this point. Judge Rovner and Judge Kirsch did not participate in consideration of the petition for rehearing en banc.

independent paths for treating the fraudulent subsidy re-
quests here as false claims under the Act.

1.  *Statutory Language*

Before 2009, the False Claims Act defined a claim this way:

> For purposes of this section, "claim" in-
> cludes any request or demand, whether under a
> contract or otherwise, for money or property
> which is made to a contractor, grantee, or other
> recipient *if the United States Government provides
> any portion of the money or property which is re-
> quested or demanded*, or if the Government will
> reimburse such contractor, grantee, or other re-
> cipient for any portion of the money or property
> which is requested or demanded.

31 U.S.C. § 3729(c) (2008) (emphasis added).

The Fraud Enforcement and Recovery Act of 2009, P.L.
111-21, amended 31 U.S.C. § 3729. Among other things,
Section 4 rewrote the definition of claim under the Act:

> (2) the term 'claim'—
>
> (A) means any request or demand, whether un-
> der a contract or otherwise, for money or prop-
> erty and whether or not the United States has
> title to the money or property, that—
>
> (i) is presented to an officer, employee, *or
> agent* of the United States; or
>
> (ii) is made to a contractor, grantee, or other
> recipient, if the money or property is to be spent
> or used on the Government's behalf or to

advance a Government program or interest, and if the United States Government—

> (I) *provides or has provided any portion of the money or property requested or demanded*; or

> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property….

31 U.S.C. § 3729(b)(2) (as amended effective May 20, 2009) (emphases added).

The pre-2009 definition reached false claims submitted to "a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded…." The post-2009 definition similarly reaches false claims for money if the United States Government "provides or has provided any portion of the money or property requested or demanded." (The 2009 amendment also addressed claims presented to agents of the federal government, discussed below.)

> 2. *Three Paths to Apply the False Claims Act*

> > a. *The U.S. Treasury Provides a Portion of Funds*

Under both the pre-2009 and post-2009 definitions of a claim, the Act can apply if the federal government provides

"any portion" of the money or property in question. The portion need not be large. Even "a drop of treasury money" given to the defrauded entity will establish liability under the False Claims Act. *Shupe*, 759 F.3d at 383, citing *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 303–04 (4th Cir. 2009), and *United States ex rel. Shank v. Lewis Enterprises, Inc.*, 2006 WL 1207005, at *7 (S.D. Ill. May 3, 2006).

Relator Heath and the federal government have offered evidence that the Universal Service Fund receives funds directly from the U.S. Treasury, in addition to the fees that telecommunications companies paid into the Fund as directed by the FCC. Those Treasury funds came from collections of delinquent debts to the Fund, along with penalties and interest, as well as civil settlements and criminal restitution payments collected by the Treasury.

The details are set forth in the briefs and supporting affidavits from FCC and USAC financial officials supplementing the United States' statement of interest. See ECF 111, 112, & 113. Over years relevant to this case, from 2003 to 2015, the Universal Service Fund received more than $100 million directly from the U.S. Treasury: approximately $50 million in collections of delinquent debts to the Fund, along with penalties and interest, and another $50 million in settlements and criminal restitution payments collected by the Treasury. Wisconsin Bell has not raised any factual dispute on this point.

The $100 million means that some portion of the Universal Service Fund is comprised of government funds. That means that fraudulent claims on the Fund were "claims" within the meaning of the False Claims Act under both the pre- and post-2009 statutory definitions of a "claim." This reasoning does not conflict with the reasoning of *Shupe*, which acknowledged

the "any portion" language and cases, 759 F.3d at 383–84, but apparently without having learned about the $100 million in the Universal Service Fund that came directly from Treasury accounts.

### b. *The USAC as Agent of Federal Government*

The second path for applying the False Claims Act focuses on language in the amendment in 2009. The amended definition reaches a claim "presented to an officer, employee, or agent of the United States," and applies "whether or not the United States has title to the money or property." 31 U.S.C. § 3729(b)(2)(A)(i). The allegedly false claims in this case were submitted to the USAC, which as noted administers the E-Rate program for the FCC.

As the Second Circuit explained in *Wells Fargo*, a principal-agent relationship requires (1) manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking. 943 F.3d at 598 (holding that Federal Reserve Banks extended emergency loans to banks as "agents of the United States" within meaning of False Claims Act); accord, Restatement (Third) of Agency § 1.01 (2006); *Lady Di's, Inc. v. Enhanced Services Billing, Inc.*, 654 F.3d 728, 735 (7th Cir. 2011) (endorsing this definition of agency).

The legal structure of the E-Rate program established by Congress and the FCC establishes all three of these elements. By creating the USAC to administer the Universal Service Fund, 47 C.F.R. § 54.701(a), the United States (through the FCC) manifested its assent for the USAC to act on the government's behalf. The USAC likewise manifested its consent to

this relationship. For years, the USAC has administered the E-Rate program and acted according to the statutory framework and implementing regulations, and the statute and regulations leave no room to deny that the FCC controls the USAC.

Wisconsin Bell disagrees, arguing that because the USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress," see 47 C.F.R. § 54.702(c), it cannot alter the United States' legal obligations and therefore does not act as an agent. That argument misunderstands agency law and attempts to read extra requirements into the statute and regulations that are not in the texts.

The USAC can be an agent even if it does not have final power to take those actions or to alter the federal government's legal obligations. The USAC is empowered to bill contributing telecommunications companies, to collect contributions from them, and to distribute funds to eligible recipients. 47 C.F.R. § 54.702(b). Each of these tasks alters the relationships between the United States and third parties. For example, third-party telecommunication companies owe the United States legally enforceable debts after the USAC bills them. The United States, through the FCC or Treasury, can later collect on these debts only because the USAC previously altered the financial relationship between the United States and the debtor. All of the USAC's actions are subject to the ultimate control of the principal, the FCC, acting as a part of the United States government. That means that all reimbursement claims subject to the 2009 amendment are subject to the Act because the USAC is an agent of the federal government.

c. *Government Funds "Provided"*

For the third path, even aside from the direct Treasury payments to the Universal Service Fund and the "agent" amendment in 2009, the federal government's role in establishing and overseeing the E-Rate program is sufficient to apply the False Claims Act here.

We reach this conclusion based on the structure and governance of the Fund and the E-Rate program. Congress ordered the FCC to collect fees from telecommunication companies to fund the program. 47 U.S.C. § 254(d). Pursuant to this mandate, the FCC sets the percentage of revenue that telecommunication companies must contribute to the E-Rate program. 47 C.F.R. § 54.709. These funds are collected and stored in an account known as the Universal Service Fund. The FCC established the USAC to administer the E-Rate program and to manage the Universal Service Fund under FCC direction. The USAC makes initial decisions about distributing the money by reviewing subsidy applications from eligible telecommunication providers, but the FCC reviews denials of subsidy applications, 47 C.F.R. § 54.719(b), offers final guidance on policy and interpretation questions, 47 C.F.R. § 54.702(c), and helps to collect overdue debts owed by telecommunications companies. ECF 111, 112, & 113.

The False Claims Act targets fraud committed against the federal government, "regardless of the particular form, or function, of the government instrumentality upon which such claims were made." *Rainwater v. United States*, 356 U.S. 590, 592 (1958). In deciding whether to apply the False Claims Act to alleged fraud aimed at a variety of agency and funding structures, courts have asked whether there is a "sufficiently close nexus" between the defrauded entity or program and

the federal government "such that a loss to the former is effectively a loss to the latter." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 738–39 (D.C. Cir. 1998) (federal grants to Howard University meant that false claims submitted to university would cause loss to federal government and were actionable under the Act).

The high degree of government involvement in the E-Rate program demonstrates that such a nexus exists here. The FCC is responsible for implementing the program's funding structure, and the U.S. Treasury maintains an active role in collecting the program's unpaid debts. As Judge Adelman wrote: "The federal government required the common carriers to pay into the Fund; in the absence of such a requirement, the carriers would not have made any payments. Thus, the federal government made the funds available." *Heath*, 111 F. Supp.3d at 926. Moreover, the FCC recognizes the E-Rate program's funds as a "permanent indefinite federal appropriation," a conclusion with which the U.S. Government Accountability Office has agreed. See GAO Report, *Telecommunications: Applications of the Antideficiency Act and Other Fiscal Controls to FCC's E-Rate Program* (Apr. 11, 2005), available at https://perma.cc/G6ZX-GGSL.

The government's involvement in the E-Rate program is far greater than in other situations where courts have held that the government did not "provide" money for purposes of the False Claims Act. For example, in *Costner v. URS Consultants, Inc.*, 153 F.3d 667 (8th Cir. 1998), the Eighth Circuit held that false payment requests submitted to a private trust fund created to finance a Superfund clean-up project did not qualify as "claims" under the False Claims Act. Even though the funds might not have existed if the federal government

had not helped negotiate the trust fund's creation, the court still held that the government did not "provide" the funds due to the combination of factors: none of the funds ever came from the Treasury; the government did not have access to the trust fund; and the government did not control the trust fund's disbursement. *Id.* at 677. In short, the relationship between the federal government and the funds was too tenuous to support False Claims Act liability.

Similarly, in *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir. 2001), the Third Circuit held that the submission of fraudulent legal bills for approval by a United States bankruptcy court did not state a "claim" under the False Claims Act. The money would not have been disbursed if the court did not approve the legal bills, but no government money was involved and there was no possible risk of financial loss to the government itself. *Id.* at 184. The bankruptcy court acts as referee among various claimants, and that role is not remotely comparable to the E-Rate program and the Universal Service Fund administered by the USAC for the FCC.

In contrast to these two cases, the Second Circuit held in *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588 (2nd Cir. 2019), that the federal government "provides" money to Federal Reserve Banks, such that fraudulent applications for emergency loans submitted to those banks were liable under the False Claims Act. As the court noted, Federal Reserve Banks do not lend out funds given to them by the Treasury. Instead, they make new funds "at a keystroke":

> When the Fed makes a $100 million loan to a bank, the bank is credited with $100 million of reserves . . . No preexisting "source" of funds exists. Crediting the loan amount to the

> borrowing bank's reserve account creates new reserves, increasing the overall level of reserves in the banking system by exactly the amount lent.

*Id.* at 603. The court's thorough opinion explicitly rejected the idea that False Claims Act coverage necessarily hinges on whether funds derive from the Treasury. It reasoned that by delegating the power to create funds to the Federal Reserve, Congress was the ultimate "source of the purchase power conferred on [] banks when they borrow from the Fed's emergency lending facilities." *Id.*

The federal government's involvement in the E-Rate program resembles its role in *Wells Fargo* much more closely than in either *Costner* or *Hutchins*. In *Costner* and *Hutchins*, the government merely approved the provision of funds. But in *Wells Fargo* and here, the government's fingerprints appear at almost every step leading up to those funds being made available. A single touchpoint may not be enough to say that the government "provided" funds, but an entire statutory and regulatory scheme designed to distribute funds through a federal program is sufficient.

The Fifth Circuit took a contrary view in *United States ex rel. Shupe v. Cisco Systems, Inc.*, 759 F.3d 379 (5th Cir. 2014), which reversed denial of a motion to dismiss a False Claims Act claim based on allegedly false claims to the USAC for reimbursement from the Universal Service Fund. We disagree with *Shupe*'s holding for three reasons.

First, as discussed above, *Shupe* did not acknowledge that funds in the E-Rate program *can* be traced back directly to the Treasury. The Treasury collects unpaid debts owed to the E-

Rate program, as well as criminal restitution payments and civil settlements stemming from the program. Any sums that the Treasury collects pass through Treasury accounts before being transferred into the E-Rate program's private account. So, quite literally, the Treasury provides money to the E-Rate program—if it were not for the Treasury's collection efforts, those funds would not be circulating in the E-Rate program.

Second, the 2009 amendment to reach fraudulent claims submitted to agents of the federal government applies at least to Heath's claims of fraud subject to that amendment because the USAC acts as an agent of the federal government.

Third, receipt of Treasury funds is a sufficient but not necessary basis for applying the False Claims Act. Conditioning application on the receipt of Treasury funds departs from the text of the False Claims Act. The Act does not require relators to trace fraudulently obtained funds back to the Treasury. Instead, it requires only that the federal government provide funding to these entities. See *Wells Fargo*, 943 F.3d at 602. In most cases, this is a distinction without a difference—federal funds are generally stored in the Treasury, see 31 U.S.C. § 3302(b), so asking whether the funds derive from the Treasury frequently serves as an effective proxy for determining whether the federal government "provided" the funds. But Congress sometimes chooses to fund federal programs in less direct ways, and the funding may not come from the Treasury straightaway. See *Wells Fargo*, 943 F.3d at 603–04; Kate Stith, *Congress' Power of the Purse*, 97 Yale L. J. 1343, 1366 (1988) (certain "statutory exceptions expressly permit particular federal agencies to receive and spend funds from private and other nongovernment sources, rather than deposit them into the Treasury for subsequent appropriation by Congress."). Even

in these more indirect circumstances, the federal government can be deemed to "provide" money for purposes of the False Claims Act by maintaining an active role in its collection and distribution, as is the case here.[7]

Our original opinion treated this government funds issue much more briefly and said that the issue presented factual disputes that would need to be resolved at trial. 75 F.4th 778, 789. Upon further consideration prompted by Wisconsin Bell's petition for rehearing and rehearing en banc, we conclude that the government funds issue can be resolved as a matter of law, at least in the absence of a genuine dispute about the evidence showing that Treasury funds have flowed directly to the Universal Service Fund administered by the USAC.

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

---

[7] In *CFPB v. Community Financial Services, Corp.*, No. 22-448 (argued Oct. 3, 2023), the Supreme Court is considering an Appropriations Clause challenge to the funding structure of the Consumer Finance Protection Bureau. Wisconsin Bell has not argued that the E-Rate program violates the Appropriation Clause. Neither party here objects to reimbursement of non-fraudulent claims from the Universal Service Fund.