*PRELIMINARY PRINT*

VOLUME 604 U. S. PART 1

PAGES 140–167

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

FEBRUARY 21, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# WISCONSIN BELL, INC. *v.* UNITED STATES EX REL. HEATH

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 23–1127.   Argued November 4, 2024—Decided February 21, 2025

The E-Rate (short for Education-Rate) program, established under the Telecommunications Act of 1996, subsidizes internet and other telecommunications services for schools and libraries across the United States. To finance those subsidies, Congress required that telecommunications carriers pay into a fund (now known as the Universal Service Fund) that is administered by the Universal Service Administrative Company, a private not-for-profit corporation.   The Company collects and distributes the resulting pot of money to beneficiaries pursuant to regulations prescribed by the Federal Communications Commission (FCC).   In addition to providing for subsidies, those regulations impose upon carriers a rule called the "lowest corresponding price" rule, which prohibits them from charging schools and libraries more than what they would charge a "similarly situated" non-residential customer.   Once an appropriate charge is set, a school can obtain its subsidy by paying the carrier a discounted price and requiring the carrier to seek the remainder from the Fund, or by paying the carrier full freight and then applying for reimbursement from the Fund.

   Respondent Todd Heath is an auditor of telecommunications bills who believes that petitioner Wisconsin Bell defrauded the E-Rate program out of millions of dollars.   According to Heath, Wisconsin Bell consistently overcharged schools in violation of the "lowest corresponding price" rule.   Heath brought suit under the False Claims Act (FCA), which enables private parties to bring civil actions on the Government's behalf to protect federal programs and funds from fraud.   The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim" as statutorily defined.   31 U. S. C. § 3729(a)(1)(A).   In Heath's view, Wisconsin Bell's violations of the "lowest corresponding price" rule led to reimbursement requests for amounts higher than the E-Rate program should have paid.   The premise of Heath's suit is that an E-Rate reimbursement request can give rise to FCA liability because it qualifies as a "claim," which, as relevant here, requires the Government to "provide[ ] or ha[ve] provided any portion of the money" requested.   § 3729(b)(2)(A)(ii)(I).

Wisconsin Bell moved to dismiss Heath's suit. In its view, an E-rate reimbursement request can never qualify as a "claim" under the FCA because the money comes from private carriers and is handled by a private corporation, meaning the Government does not "provide[ ] any portion of the money" requested. The District Court and the Seventh Circuit rejected that argument. The Court of Appeals held that the Government "provided" E-Rate program funding for two independent reasons. First, it held that the Government provided all the money in the program through its regulatory role in the collection and distribution of contributions. Second and more narrowly, it found that the Government provided some "portion" of E-Rate funding by depositing into the Fund, in the relevant years, more than $100 million directly from the U. S. Treasury.

*Held*: The E-Rate reimbursement requests at issue are "claims" under the FCA because the Government "provided" (at a minimum) a "portion" of the money applied for by transferring more than $100 million from the Treasury into the Fund. §3729(b)(2)(A)(ii)(I). The question is whether the Government "provided"—in ordinary meaning, supplied, furnished, or made available—any portion of the money sought. While the parties (mirroring the Seventh Circuit's opinion) discuss two independent theories under which the Government potentially "provided" the requested funds, here it is enough that the Government provided *some* E-Rate moneys through the Treasury's own transfer of over $100 million into the Fund. That amount consisted of delinquent contributions that the FCC and Treasury Department collected from carriers, as well as civil settlements and criminal restitution payments from Justice Department activities in response to wrongdoing in the E-Rate program. The Government therefore "provided [a] portion of the money" disbursed from the Fund to reimburse E-Rate program participants.

Wisconsin Bell argues that even the $100 million was provided only by the carriers, with the Government playing no more than an intermediary role. But to start with, Wisconsin Bell mischaracterizes the Government's role. Rather than acting as a passive throughway for the transmission of the $100 million, it generated that money itself by extracting it from carriers and by prosecuting wrongdoing in the E-Rate program. And anyway, a simple intermediary can sometimes also "provide" things to a recipient—and the Government, even if viewed only in that light, would do so here. For example, a proctor for an exam "provides" blue books and pencils to students, even if she has not purchased them herself and has instead gotten them from the school. The same is true here: The Government "provided" the relevant $100 million to the Fund by collecting it and routing it through Treasury accounts.

Here, in the years relevant to Heath's FCA suit, the Government "provided" a "portion of the money requested" for E-Rate subsidies by collecting, holding, and transferring $100 million by way of the Treasury. Indeed, those transfers look like most Government spending: Money usually comes to the Government from private parties, and it then usually goes out to the broader community to fund programs and activities. That conclusion is enough to enable Heath's FCA suit to proceed. Pp. 148–155.

92 F. 4th 654, affirmed and remanded.

KAGAN, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion, in which KAVANAUGH, J., joined, and in which ALITO, J., joined as to Part I, *post*, p. 155. KAVANAUGH, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 167.

*Allyson N. Ho* argued the cause for petitioner. With her on the briefs were *Helgi C. Walker*, *Andrew LeGrand*, *Ashley E. Johnson*, *Stephen J. Hammer*, and *Patrick J. Fuster*.

*Tejinder Singh* argued the cause for respondent. With him on the brief were *David J. Chizewer*, *Roger A. Lewis*, and *Harleen Kaur*.

*Vivek Suri* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Prelogar*, *Principal Deputy Assistant Attorney General Boynton*, *Deputy Solicitor General Stewart*, *Michael S. Raab*, *Charles W. Scarborough*, and *Kevin J. Kennedy.**

————————

*Briefs of *amici curiae* urging reversal were filed for the Center for Constitutional Responsibility by *Steven P. Lehotsky*, *Andrew B. Davis*, and *Karen R. Harned*; for the Chamber of Commerce of the United States of America by *John P. Elwood* and *Andrew R. Varcoe*; for the DRI–Center for Law and Public Policy by *Mary Massaron*; for USTelecom–The Broadband Association et al. by *Scott H. Angstreich*; and for the Washington Legal Foundation by *John M. Masslon II* and *Cory L. Andrews*.

Briefs of *amici curiae* urging affirmance were filed for the Anti-Fraud Coalition by *Chandra A. Napora*; for Professors of Law et al. by *Michael Lieberman* and *Jamie Crooks*; and for the Southern Education Foundation et al. by *Meredith R. Aska McBride*.

JUSTICE KAGAN delivered the opinion of the Court.

The E-Rate (short for Education-Rate) program subsidizes internet and other telecommunications services for schools and libraries across the United States. Established under the Telecommunications Act of 1996, 110 Stat. 56, the program disburses funds—collected from telecommunications carriers and managed by a private corporation—to cover a substantial percentage of a school's internet costs. The funds are payable, under Federal Communications Commission (FCC) regulations, to either a carrier or a school upon receipt of a reimbursement request.

This case asks us to decide whether such a request can count as a "claim" under the False Claims Act (FCA or Act), 31 U. S. C. §§ 3729–3733. The FCA protects government funds and programs by imposing civil liability on any person who knowingly presents a false or fraudulent "claim" as statutorily defined. In the part of the definition relevant here, a request for money qualifies as a claim if the Government "provides or has provided any portion of the money . . . requested." § 3729(b)(2)(A)(ii)(I). We hold today that the E-Rate reimbursement requests at issue satisfy that requirement because the Government provided (at a minimum) a "portion" of the money applied for. In the years in which those requests were made, the Government transferred more than $100 million from the Treasury into the pool of funds used to pay E-Rate subsidies. That is enough to create a "claim" under the Act, and to allow a suit alleging fraud to go forward.

I

Congress and the FCC have long worked to ensure that "all the people of the United States" have access, at reasonable prices, to telecommunications and information services. 47 U. S. C. § 151; see § 254(b). In keeping with that goal, the Telecommunications Act of 1996 directed the FCC to establish several so-called universal-service programs for popula-

tions or institutions needing improved access. See § 254.
That statute identified, for example, consumers in rural
areas, consumers with low incomes, and—critical here—
elementary schools, secondary schools, and libraries as ap-
propriate recipients of subsidies or other assistance. See
§§ 254(b), (h)(1).

To finance those measures, Congress required that tele-
communications carriers pay into a fund—now known as the
Universal Service Fund—as FCC regulations prescribe.
See § 254(d). Under those rules, the FCC determines each
quarter the percentage of revenues that a carrier must con-
tribute. See 47 CFR §§ 54.706, 54.709(a) (2023). The FCC,
however, does not manage the Fund's day-to-day operations.
Rather, it has "appointed" the Universal Service Administra-
tive Company, a private not-for-profit corporation, as the
Fund's "Administrator." § 54.701(a); see App. 34. The Ad-
ministrative Company generally bills and collects contribu-
tions from carriers—though the FCC plays a role in pursu-
ing delinquents. See § 54.702; App. 37–38, 40–43; *infra*,
at 150. And the Company distributes the resulting pot of
money, as FCC rules provide, to program beneficiaries.
See § 54.702(b).[1]

Among those beneficiaries are public and private schools
and libraries, under what is commonly called the E-Rate pro-
gram. See 47 U. S. C. §§ 254(b)(6), (h)(1)(B); 47 CFR § 54.500
*et seq.* That program subsidizes between 20 and 90 percent
of a school's total charges for internet and other telecommu-
nications services, with higher percentages for schools in
rural or low-income areas. See §§ 54.505(a)–(c). And the
program protects the value of that subsidy by preventing a

—————

[1] The precise relationship between the FCC and the Administrative
Company is in dispute in other litigation. See, *e. g.*, *Consumers' Research*
v. *FCC*, 109 F. 4th 743, 750 (CA5) (en banc), cert. granted, 604 U. S. 1029
(2024). The details of that relationship are irrelevant here, and we ex-
press no views on that score. Nor do we comment on any other matter
pertaining to the constitutionality of the universal-service programs.

carrier from inflating its non-discounted prices. Under the "lowest corresponding price" rule, a carrier may not charge a school a higher sticker price than it would charge a "similarly situated" customer. §§ 54.500, 54.511(b). Once an appropriate charge is set, a school can obtain its subsidy in either of two ways. See § 54.514(c). The school can pay the carrier only the discounted price, thus requiring the carrier to seek the remainder from moneys held in the Fund. Or the school can pay the carrier full freight and itself apply for reimbursement.

Respondent Todd Heath is an auditor of telecommunications bills who believes that petitioner Wisconsin Bell defrauded the E-Rate program out of millions of dollars. According to Heath, the carrier flouted the FCC's "lowest corresponding price" rule for more than a decade (from 2002 to 2015) by charging schools a higher full price than it charged other, similarly situated customers. And as Heath notes, overcharges of that kind inevitably lead to overpayments from the Fund. Take a hypothetical example. If the lowest corresponding price for a service is $1,000 and a school is entitled to a 60% subsidy, then the E-Rate program should pay out $600. But if Wisconsin Bell, in violation of the rule, instead charged the school a full price of $1,500, then the program would instead confer a subsidy of $900. (And the school, rather than pay $400, would pay $600.) The carrier, in Heath's view, thus wrongly amassed revenues at the E-Rate program's expense.

That accusation is at the heart of a lawsuit Heath brought against Wisconsin Bell under the FCA. Enacted during the Civil War to protect federal programs and funds from fraud, that law enables private parties to bring civil actions on the Government's behalf, and to share in any monetary recovery. See *United States ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U. S. 419, 424–425 (2023). A defendant is liable under the Act if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment." 31

U. S. C. § 3729(a)(1)(A).  In Heath's view, Wisconsin Bell engaged in that conduct many times over by way of violating the FCC's "lowest corresponding price" rule.  App. 62–82 (complaint).  All those violations led to reimbursement requests, by either Wisconsin Bell or a school, for amounts higher than the E-Rate program should have had to pay. Plus, all Wisconsin Bell's own requests included a false certification (or so Heath alleged) that it had complied with the program's rules, including the one about pricing.

The premise of Heath's suit is that an E-Rate reimbursement request can give rise to FCA liability because it fits within the statute's definition of the term "claim."  That definition varies depending on whether a "request or demand" for money is made to a federal employee or agent, or instead to an "other recipient."  § 3729(b)(2)(A).  Assuming that the Administrative Company—the recipient of E-Rate reimbursement requests—falls within the "other" rather than the "agent" category, such a request must meet two requirements to count as an FCA "claim."[2]  First, the money requested must be "spent or used on the Government's behalf or to advance a Government program or interest."  § 3729(b)(2)(A)(ii).  And second, the Government must "provide[ ] or ha[ve] provided any portion of the money" requested.  § 3729(b)(2)(A)(ii)(I).  The statutory definition, though, also offers a caveat: It is immaterial, in assessing whether those requirements are met, "whether or not the United States has title to the money" at issue. § 3729(b)(2)(A).[3]

---

[2] The parties have disputed throughout this litigation whether the Administrative Company is actually an "agent" of the United States, and therefore not subject to the two requirements about to be described.  But our disposition of this case makes that issue immaterial, and we therefore express no view of its merits.  See *infra*, at 148, n. 4 (noting the Court of Appeals' treatment of the question).

[3] Congress's most recent amendments to the "claim" definition (which included adding the title provision) occurred in 2009, after some of the disputed reimbursement requests were made.  But Wisconsin Bell does

Wisconsin Bell moved to dismiss Heath's suit, arguing that under the FCA's definition an E-Rate reimbursement request can never qualify as a "claim." The carrier did not deny that the money so requested "advance[s] a Government program," as the definition first requires. That money, after all, simply *is* the E-Rate program's subsidy. But Wisconsin Bell contended that an E-Rate reimbursement request flunks the second requirement, because the Government does not "provide[ ] any portion of the money" requested. In Wisconsin Bell's view, all the money in the E-Rate program is "private," rather than "federal." No. 2:08–cv–00724 (ED Wis., Nov. 25, 2014), ECF Doc. 97, p. 6. That is because the money comes from private carriers' contributions, and a private corporation handles its collection and disbursement. See *id.*, at 12–13. "The federal government," Wisconsin Bell averred, does not provide "a single penny to the Fund." *Id.*, at 12.

After the District Court denied the motion, the Court of Appeals for the Seventh Circuit held that E-Rate reimbursement requests fit the FCA's definition of "claim." The Court of Appeals found two "independent paths" for concluding, contra Wisconsin Bell, that the Government "provided" E-Rate program funding. 92 F. 4th 654, 666 (2024). First, the court held that the Government provided all the money in the program through its regulatory role in the "collection and distribution" of contributions—most notably, by initially

not contend that those amendments require separate analysis of the pre- and post-2009 requests to resolve the issues we address. In discussing those issues, the carrier cites the current definition and describes the amendments (including the title provision) as merely clarifying existing law. See Brief for Wisconsin Bell 24–25, 39; Reply Brief 5–6. We assume without deciding that its characterization is correct, and thus use only the FCA's current definition of "claim." Cf. *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 579 U. S. 176, 185, n. 1 (2016) (noting in another FCA case involving both pre- and post-2009 requests that no party argued and "we thus do not consider[ ] whether pre-2009 conduct should be treated differently").

requiring the carriers to pay into the Fund. *Id.*, at 671; see *id.*, at 669. Second and more narrowly, the court found that the Government provided some "portion" of E-Rate funding by depositing into the Fund, in the relevant years, "more than $100 million directly from the U. S. Treasury." *Id.*, at 667. That contribution of Treasury money, even if a small part of the Fund's total, was enough to qualify the E-Rate reimbursement requests as FCA "claims." See *ibid.*[4]

In a similar case, the Court of Appeals for the Fifth Circuit held that E-Rate reimbursement requests do not so qualify—although that court considered only the "broad[er] view" of how the Government "provides" E-Rate funding. *United States ex rel. Shupe* v. *Cisco Systems, Inc.*, 759 F. 3d 379, 383–384 (2014) (*per curiam*); *id.*, at 387–388 (finding the FCC's "regulatory supervision" of the program insufficient to show that the Government provided E-Rate funds).

We granted certiorari to resolve the circuit split over whether E-Rate reimbursement requests are FCA "claims." 602 U. S. 1030 (2024). We need reach no further today than the narrower ($100 million) ground on which the court below ruled. The requests at issue qualify as claims because, in the years they were submitted, the U. S. Treasury deposited money into the Fund for disbursement to those entitled to E-Rate subsidies.

II

The E-Rate reimbursement requests at issue count as FCA "claims" if the Government "provides or has provided any portion of the money" requested. §3729(b)(2)(A)(ii)(I). Is that language satisfied when a school or carrier asks for E-Rate program funds? Because the Act does not define

---

[4] Finding yet a third path to the same outcome, the Seventh Circuit also held that the Administrative Company is an "agent" of the Government. See 92 F. 4th, at 667–668. As noted above, that conclusion (if correct) obviates the FCA's requirement that the Government "provide" any part of the requested money. See *supra*, at 146, n. 2.

the word "provides," we look to its ordinary meaning. To "provide" means to "supply," to "furnish," or to "make available." American Heritage Dictionary 1411 (4th ed. 2000); 12 Oxford English Dictionary 713 (2d ed. 1989); see *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. 657, 676 (2020) (defining "provide" the same way). The question thus becomes whether the Government supplied, furnished, or made available any portion of the money here sought.

The parties' arguments on that score mirror the two "independent paths" laid out in the Seventh Circuit's opinion. 92 F. 4th, at 666; see *supra*, at 147–148. Wisconsin Bell and Heath dispute whether the Government provides *all* E-Rate moneys through its regulatory authority over the program, especially its mandate that carriers contribute to the Fund. But so too the parties contest whether the Government has provided *some* E-Rate moneys through the Treasury's own transfer into the Fund of over $100 million, to pay for program subsidies.

If Heath prevails on either one of those theories, he has met the FCA's definition of "claim." Under that definition, providing some funds is just as good as providing all: The Government, recall, need provide only "any portion" of the amount requested. § 3729(b)(2)(A)(ii)(I); see *United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*, 562 F. 3d 295, 303 (CA4 2009) ("So long as '*any portion*' of the claim is or will be funded by U. S. money," the "full claim satisfies the definition"). Wisconsin Bell acknowledges that point, as it must. See Tr. of Oral Arg. 24. So if the Government, by making direct payments, has provided even a small fraction of the money used to fund E-Rate reimbursements, the question presented here is resolved. It is then immaterial whether the Government, by exercising regulatory control, provides all the money so used. Even supposing not, the reimbursement requests are "claims" for payment, and Heath's suit for fraud can go forward.

And as the Court of Appeals explained, the Government—more specifically, the U. S. Treasury—has put substantial money into the Fund to finance E-Rate subsidies. See 92 F. 4th, at 667. The more than $100 million deposited in the relevant years came from two sources. About half consisted of delinquent contributions (plus associated interest and penalties) that the FCC and Treasury Department collected from carriers after the Administrative Company proved unable to do so. Those federal agencies, acting under a law providing for the collection of sums "owed to the United States," placed the money they garnered in Treasury accounts. 31 U. S. C. § 3701(b)(1); see §§ 3711, 3717; App. 35–38, 40–43. From there, the Treasury made periodic transfers to the Fund for disbursement to program participants. See *id.*, at 37–38, 42–43. The other half of the $100 million derived from Justice Department activities. See *id.*, at 38, 43. When that Department learns of wrongdoing in the E-Rate program, its lawyers may proceed in diverse ways against the malefactors—maybe under the FCA itself, or under antitrust laws, or under criminal bans on mail or wire fraud. Any civil settlements or criminal restitution payments resulting from those actions go into Treasury accounts. And once again, that money eventually makes its way to the Fund to bankroll E-Rate subsidies.

So to return to the language of the relevant definitional provision: The Government "provided [a] portion of the money" disbursed from the Fund to reimburse E-Rate program participants. § 3729(b)(2)(A)(ii)(I). Or to use the synonyms previously offered: The Government supplied funds, furnished funds, and made available funds for that purpose. It is a simple matter, as the saying goes, of following the money. Again, federal agencies accumulated the roughly $100 million and placed it in the U. S. Treasury—the repository for "all monies received by the United States." K. Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1356 (1988). And the Treasury later transferred those sums to

the Fund for use in fulfilling E-Rate reimbursement requests. Or as the Seventh Circuit put the point: Because the Treasury held and conveyed to the Fund the $100 million, "quite literally, the Treasury provide[d] money to the E-Rate program." 92 F. 4th, at 670.[5]

Wisconsin Bell resists that conclusion, arguing that even the $100 million was provided by, and only by, the carriers. See, *e. g.*, Brief for Wisconsin Bell 27 ("The E-rate program is funded entirely by private carriers' contributions"). On that alternative view, the Government played no more than an intermediary role: It "merely collected and held" the carriers' required payments "pending their return" to "their rightful owner, the Administrative Company." *Id.*, at 31. And "facilitat[ing] the transfer of money," Wisconsin Bell says, does not amount to "provid[ing]" money. *Id.*, at 30. Rather, the deposits that the Treasury put into the Fund "are no different than" the carriers' "contributions themselves." Tr. of Oral Arg. 5; see *id.*, at 23. The former stand in for the latter, and remain just as private.

_____

[5] The Court of Appeals for the Fifth Circuit, although rejecting the regulatory-control theory of providing funds, never addressed the alternative, follow-the-money theory just described. See *United States ex rel. Shupe* v. *Cisco Systems, Inc.*, 759 F. 3d 379, 382–388 (2014) (*per curiam*); *supra*, at 147–148. That omission apparently resulted from the Government's litigation choices. Only in the Seventh Circuit—not in the Fifth— did the Government press the narrower theory and submit supporting evidence about the Treasury's deposit of moneys into the Fund. Had the Fifth Circuit seen the same evidence, it may well have responded as the Seventh did. Indeed, its own analysis suggests as much. For under the Fifth Circuit's approach, the definition of "claim" is met "when United States Treasury dollars flow to the defrauded [program]." *Shupe*, 759 F. 3d, at 383; see *ibid.* (noting with approval that "courts have found that the Government 'provides any portion' of the money requested when the Government has given [a program] even a drop of treasury money"); *id.*, at 388 (concluding that the Government did not provide any of the requested money because "there are no federal funds involved in the [E-Rate] program").

But to start with, Wisconsin Bell mischaracterizes the Government's role in bringing the $100 million to the Fund. The Government was not a passive throughway for the transmission of E-rate moneys from one private party (the carrier) to another (the Administrative Company). Nor were the Government's activities confined to "facilitating" such transfers, as Wisconsin Bell would have it. Take first the $50 million in delinquent contributions, on which Wisconsin Bell almost wholly focuses. The FCC and Treasury Department extracted those moneys from carriers that, even after the Administrative Company's entreaties, refused to pay on schedule. Without the agencies' dunning, the contributions would have come in yet later—or might never have arrived. (And if no contributions, likely no interest or penalties either.) Still less does the other $50 million—from settlement and restitution awards—align with Wisconsin Bell's story. Those awards came from the Justice Department's efforts to prosecute wrongdoing in the E-Rate program. And the amounts obtained thus reflected not the carriers' regular contributions but the harms that fraudulent conduct had imposed on the Fund and its beneficiaries. So the Government, in forwarding those payments to the Fund, did not serve as a program middleman or facilitator. Rather, the Government itself generated the moneys it provided.

And anyway, a simple intermediary can sometimes also "provide" things to a recipient—and the Government, even if viewed only in that light, would do so here. Wisconsin Bell assumes that only one entity can provide a thing, so that if a carrier gave a contribution to the Government to give to the Fund, then the carrier alone provided the money. But why not say that both did so—the originator of the money and the transmitter alike? Consider a perhaps dated example used at oral argument. See *id.*, at 13–14. A proctor for an exam gives out blue books and pencils to students. She has not purchased them herself; rather, she has gotten them from the school. It would still be natural to say that she

(along with the school) has "provided"—has supplied, furnished, or made available—the booklets and pencils. Similar real-world examples abound. A bank teller "provides" an account holder with money, even though the recipient's employer deposited the relevant funds. A UPS driver "provides" a person with a package, even though the driver first picked up the box from a department store. In each case, not only the original source but also the middleman (the intermediary, transmitter, facilitator, what have you) provides the thing at issue. And the same is true here. Supposing that carriers "provided" the relevant $100 million to the Fund, so too did the Government by collecting it and routing it through Treasury accounts.

Nothing about the ownership of the $100 million while in the Treasury matters to that conclusion, in the way Wisconsin Bell at times suggests. In its view, those moneys were first owned by private carriers and then owned by the private Administrative Company—but not owned by the Government in the interim period when it had "temporary possession." *Id.*, at 22. Perhaps. Or perhaps not—the Government (as well as Heath) takes the opposite view. See Brief for United States as *Amicus Curiae* 21–22. The important point here is that the answer is irrelevant. Consider the examples just given: No one would say that the proctor or the teller or the UPS driver does not "provide" (again, supply, furnish, or make available) the relevant item just because she does not own it while making the transfer. And so too here. Were there any doubt, another aspect of the FCA's definition of the term "claim" clears it away. Recall that the definition—including its provides-the-money requirement—can be met "whether or not the United States has title to the money" at issue. § 3729(b)(2)(A); see *supra*, at 146.[6] So as the FCA sees

───────────

[6] As noted earlier, we assume without deciding that this provision, enacted in 2009, merely clarified existing law, and thus that the view it takes is relevant to the pre-2009, as well as the post-2009, claims in this case. See *supra*, at 146–147, n. 3.

the matter, the technical ownership of the $100 million that the Government conveyed to the Fund makes not a whit of difference. Either way, its transfers can form the basis of an FCA suit.

Those transfers, indeed, look like most Government spending—neither more nor less private, neither more nor less public. Money usually comes to the Government from private parties—through taxes, fines, or fees of all kinds. And then money usually goes out to the broader community, to fund any number of programs and activities. Between the time money comes in and the time money goes out, it sits—as the $100 million here did—in Treasury accounts. In this broad array of schemes, the funding received may be more or less earmarked, and it may be disbursed more or less quickly. But the basic mechanism remains the same. Money enters and then exits the public fisc; the Government collects money and then furnishes it for some use. And so it was here, in the years relevant to Heath's FCA suit. The Government obtained $100 million in delinquent contributions, settlement awards, and restitution payments related to the E-Rate program. It held that money for a time in the U. S. Treasury. And then it supplied that money to reimburse program participants—"provid[ing]," as the FCA requires, a "portion of the money" requested for schools' E-Rate subsidies.

## III

What we have said above is enough to enable Heath's FCA suit to proceed. The reimbursement requests at issue qualify as "claims" under the FCA because, in the years they were made, the Government deposited money into the Fund to pay for E-Rate subsidies. And all the statute requires is that those deposits provide "any portion"—not the whole— of the sums requested. For that reason, we need not address the alternative theory that the Government provides all E-Rate funds by exercising regulatory control over the

program. Whether or not that is so, Heath can press his claim that, by violating the "lowest corresponding price" rule, Wisconsin Bell "knowingly present[ed], or cause[d] to be presented," a set of "false or fraudulent claim[s] for payment." §3729(a)(1)(A).

If Heath prevails on the merits, issues about damages may well emerge. At oral argument, the parties forecast their differences on those issues—including about whether (and, if so, how) the amount of money the Government deposited should limit the damages Heath can recover. See, *e.g.*, Tr. of Oral Arg. 24–26, 29–32, 53–54, 66–68, 93–94. But those issues were not briefed in this Court, and in any event are a long way away. We therefore leave them for the courts below to decide, should it ever become necessary to do so.

For the reasons stated, we affirm the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE KAVANAUGH joins, and with whom JUSTICE ALITO joins as to Part I, concurring.

I join the Court's opinion in full because it correctly holds that, for purposes of the False Claims Act (FCA), the Federal Government "provides" money to the Education Rate (E-Rate) program when the Government itself collects overdue contributions, interest, penalties, settlements, and restitution payments, and then transfers that money from U. S. Treasury accounts into the E-Rate program. See 31 U. S. C. §3729(b)(2)(A)(ii)(I). The Court saves for another day two more difficult questions: *First*, whether the Government "provides" the money that it requires private carriers to contribute to the E-Rate program, see *ibid.*; and *second*, whether the E-Rate program's administrator is an agent of the United States. I express no definitive views on those questions today. I write separately only to highlight that

the Government's positions on these questions might, if accepted, have significant implications for both the scope of the FCA and the lawfulness of the E-Rate program.

I

The question presented in this case is whether reimbursement requests submitted to the E-Rate program are "claims" under the FCA. See § 3729(b)(2). As the Court's opinion explains, *ante*, at 146, the definition of "claim" depends on the person or entity to whom the request for money is made. If the request is made to a federal officer, employee, or agent, then any request for money qualifies as a "claim." § 3729(b)(2)(A)(i). But, if the request is made to some "other recipient," then the request is a "claim" only in limited circumstances, such as if the Federal Government "provides or has provided any portion of the money" requested and the money is to be spent or used "to advance a Government program or interest." § 3729(b)(2)(A)(ii).

All agree that E-Rate reimbursement requests are made to the Universal Service Administrative Company (Administrative Company). The Administrative Company is a private not-for-profit corporation whose parent entity, the National Exchange Carrier Association (Carrier Association), is another private not-for-profit corporation. See 47 CFR §§ 54.5, 69.602 (2023).

The Federal Communications Commission (FCC) has "appointed" the Administrative Company as "Administrator" of the Universal Service Fund (Fund). See § 54.701(a). The Fund is composed primarily of money from private telecommunications carriers. It is undisputed that a federal statute requires certain carriers to contribute "to the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service." See 47 U. S. C. § 254(d). FCC regulations in turn mandate that certain carriers contribute to the Fund on a quarterly basis. 47 CFR §§ 54.706(a)–(b), 54.709(a). FCC regulations also task the

Thomas, J., concurring

Administrative Company with disbursing the money in the Fund to beneficiaries of the E-Rate program and other universal service initiatives. §54.702(b).*

The Government offered us three different paths to finding that an E-Rate reimbursement request satisfies the FCA's definition of "claim." First, assuming that the Administrative Company is an "other recipient," the Government argued that the Government provides all the money in the Fund because federal law requires private carriers to contribute to it. Second, the Government contended that even if it does not provide all the money, it provided at least a "'portion'" of it during the years relevant to this case because "the [FCC], the Department of the Treasury, and the Department of Justice collected more than $100 million in contributions, interest, and penalties from delinquent carriers; held the money in Treasury accounts; and then deposited the money in the Fund." Brief for United States as *Amicus Curiae* 7–8. Third, the Government argued that even if it does not provide any money to the Fund, an E-Rate reimbursement request is a "claim" under the FCA because the Administrative Company—the entity to whom a request for money is made—is an "agent of the United States." §3729(b)(2)(A)(i).

The Court resolves this case on the second ground alone. During the years relevant here, the Treasury Department deposited more than $100 million directly into the Fund. Of that sum, approximately $50 million came from delinquent contributions and related interest and penalties, and the other $50 million came from settlements and restitution awards obtained by the Justice Department. I understand the Court to have decided that on the facts of this case— where the Government itself exercised its power to collect overdue contributions, interest, penalties, settlements, and

---

*As the Court's opinion explains, see *ante*, at 144, n. 1, the nature of the relationship between the FCC and the Administrative Company is the subject of ongoing litigation. I express no view on that matter.

restitution awards, and then transferred those funds from
U. S. Treasury accounts into the Fund—the Government
"provided" money within the meaning of the FCA.
§ 3729(b)(2)(A)(ii).

I do not understand the Court to have opined on any other
set of facts. The opinion explains that, in making the trans-
fers at issue here, the Government "was not a passive
throughway." *Ante*, at 152. Rather, the FCC and the
Treasury Department used the power of the Government to
"extrac[t]" money from private carriers. *Ibid.* The Justice
Department, for its part, "prosecute[d] wrongdoing," and
then obtained settlements and restitution awards. *Ibid.*
The Court observes that, "[w]ithout the agencies' dunning,"
the money the Government collected would have come later
"or might never have arrived." *Ibid.* Thus, that "the Gov-
ernment itself generated the moneys it provided" is an es-
sential component of our decision. *Ibid.* I do not under-
stand us to have resolved whether the Government would
have "provided" money in the relevant sense,
§ 3729(b)(2)(A)(ii), if it *had* acted as a "passive throughway"
or a mere "transmitter" or "facilitator," *ante*, at 152. I
agree with the Court's resolution of the narrow question be-
fore us, and I am pleased to join in full. The remainder of
this opinion considers issues that the Court does not reach.

## II

### A

The Government's leading theory in this case was that the
FCA applies to E-Rate reimbursement requests because the
Government provides *all* the money in the Fund. Brief for
United States as *Amicus Curiae* 12–16; Tr. of Oral Arg. 85
(asserting that the United States would "prefer to win on
th[is] ground"). It is undisputed that federal law and the
FCC's implementing regulations require private telecommu-
nications carriers to contribute on a quarterly basis to the
Fund. See 47 U. S. C. § 254(d); 47 CFR §§ 54.706(a)–(b),

54.709(a). According to the Government, because a federal statute compels these contributions, the Government "provides" all the money that private carriers pay. 31 U. S. C. §3729(b)(2)(A)(ii).

Two Courts of Appeals have considered this argument. The Seventh Circuit agreed with the Government in the decision below. It observed that, in deciding whether the FCA applies to alleged fraud aimed at a particular entity, "courts have asked whether there is a 'sufficiently close nexus' between the defrauded entity or program and the federal government 'such that a loss to the former is effectively a loss to the latter.'" 92 F. 4th 654, 669 (2024). The court concluded that the "high degree of government involvement in the E-Rate program demonstrates that such a nexus exists here." *Ibid.*

The Fifth Circuit reached the opposite conclusion, holding that the Government's "broad view" is "unsupported by the cases interpreting the FCA." *United States ex rel. Shupe* v. *Cisco Systems, Inc.*, 759 F. 3d 379, 383 (2014). The Fifth Circuit explained that courts have traditionally "limited the FCA's application to instances of fraud that might result in financial loss *to the Government*." *Id.*, at 385 (internal quotation marks omitted; emphasis added). And, it observed that courts have declined to extend the FCA's protections to programs that "do not receive federal funds" and "have too tenuous of a relationship to the Government to be considered a Government entity." *Id.*, at 384. While acknowledging that "the FCC retains some oversight and regulation" over the Administrative Company, the Fifth Circuit nevertheless concluded that the FCA's protections do not apply to E-Rate reimbursement requests because the Administrative Company is "a private corporation owned by an industry trade group." *Id.*, at 387.

Critically, both the Fifth and Seventh Circuits recognized that courts have traditionally interpreted the FCA to cover fraud against only those defrauded entities that receive fed-

eral funding or operate with a "high degree of government involvement." 92 F. 4th, at 669; see also *Shupe*, 759 F. 3d, at 383–385. The courts disagreed about whether the relationship between the Administrative Company and the Federal Government is sufficiently close. But, neither court posited that the FCA covers fraud against *private* entities that lack both federal funding and a "sufficiently close nexus" with the Federal Government. 92 F. 4th, at 669 (internal quotation marks omitted).

This Court's case law strongly suggests that the FCA does not cover fraud against purely private entities with purely private funding sources. We have always assumed that the FCA does not cover acts directed toward parties that are not "the Government." *Allison Engine Co.* v. *United States ex rel. Sanders*, 553 U. S. 662, 669–670 (2008). We have said that the purpose of the FCA was "to provide for restitution to the government of money taken from it by fraud." *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 551 (1943). And, we have repeatedly remarked that the FCA exists to "'protect the funds and property *of the Government*.'" *United States ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U. S. 419, 424 (2023) (quoting *Rainwater* v. *United States*, 356 U. S. 590, 592 (1958); emphasis added); see also *United States* v. *McNinch*, 356 U. S. 595, 599 (1958) (explaining that Congress enacted the FCA because it "wanted to stop th[e] plundering of the public treasury"); *United States* v. *Neifert-White Co.*, 390 U. S. 228, 233 (1968) (explaining that a prior version of the FCA extended to "all fraudulent attempts to cause *the Government* to pay out sums of money" (emphasis added)).

Relying on this understanding of the scope of the FCA, lower courts have determined that a program does not receive FCA protections unless it receives money that belongs to the Government or the Government controls the program. For example, the Eighth Circuit held that false payment requests submitted to a private trust fund created to finance a

CERCLA Superfund cleanup project did not qualify as "claims" under the FCA. *Costner* v. *URS Consultants, Inc.*, 153 F. 3d 667, 677 (1998). While recognizing that the funds might not have existed if the Government had not helped negotiate the trust fund's creation, the court still held that the Government did not "provide" the funds because none of the funds came from the Treasury, the Government did not have access to the trust fund, and the Government did not control the trust fund's disbursement. *Ibid.* Similarly, the Third Circuit refused to apply the FCA to fraudulent legal bills submitted for approval to a United States Bankruptcy Court because the Government itself would not suffer any financial loss. *Hutchins* v. *Wilentz, Goldman & Spitzer*, 253 F. 3d 176, 182–184 (2001). The court explained that "the submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act." *Id.*, at 184. The Fifth Circuit identified several other examples of courts interpreting the FCA in a similar way. See *Shupe*, 759 F. 3d, at 384–385 (collecting cases).

In this case, the Government paid scant attention to the fact that courts historically have not applied the FCA to cover fraud on nongovernment entities unless the Government itself will face a financial loss. Assuming that approach is correct, it is not obvious to me that the Government puts its own funds at risk when it requires private parties to fund the E-Rate program. Ordinary E-Rate contributions come from private carriers. And, if the carrier contributions are insufficient to fund the E-Rate program, the Administrative Company must turn to private sources of credit—not the Federal Government—to remedy any budgetary shortfall. See 47 CFR §54.709(c). It is difficult for me to see how the loss of ordinary contributions from carriers is necessarily a loss to the Government.

The political branches chose to separate the program from the public fisc. That choice was made in part to prevent the

E-Rate program from being "turned into a piggy bank which can be raided" "for budgetary gains." 143 Cong. Rec. 16054 (1997) (statement of Sen. Kerrey); accord, *ibid.* (statement of Sen. Daschle). Whatever the merits of that choice, I suspect it might carry consequences for the applicability of the FCA.

B

Before we accept the Government's theory that the FCA applies so long as the Government requires one private party to pay another private party, we ought to grapple with that argument's implications. If the Government's position is correct, then the FCA would seem to cover a wide range of matters until now understood to be outside the scope of the statute. Consider a few examples.

Federal law authorizes States to withhold federal pay and retirement benefits "to enforce the legal obligation of the individual to provide child support." 42 U. S. C. § 659(a). This law therefore facilitates a payment from one private party to another. If this Court were to accept that such a law is all it takes for the Government to "provid[e]" money under the FCA, then the FCA would seem to cover false or fraudulent claims made against a recipient of child-support payments because a request for money is made to an "other recipient," and the money is spent or used to advance a Government "interest." 31 U. S. C. § 3729(b)(2)(A)(ii). But, applying the FCA in this context would significantly expand the reach of the statute.

Or, consider a civil judgment for money damages entered by a federal court. The entry of such a judgment has the effect of requiring a private party to pay a sum of money to another private party. If this Court were to hold that the Government "provides" money for FCA purposes so long as the Federal Government requires a person to pay a sum of money to someone else, then it seems possible that the FCA might cover at least some false or fraudulent requests for money made to a recipient of money damages. The request

would be made to an "other recipient" and, at least in some instances, money damages might be spent or used "to advance a Government . . . interest." §3729(b)(2)(A)(ii).

Another example is the individual mandate component of the Affordable Care Act, 124 Stat. 119. That provision requires individuals to purchase "minimum essential" health insurance coverage. 26 U. S. C. §5000A(a). If we were to accept the Government's broad theory of what it means to provide money for purposes of the FCA, I am not sure why the FCA would not cover at least some false or fraudulent requests for money made to private health insurance companies whose customers purchased health insurance because of the individual mandate. A health insurance company appears to be an "other recipient," and it is at least plausible that the money health insurers spend on medical care "advance[s] a Government program or interest." 31 U. S. C. §3729(b)(2)(A)(ii).

Perhaps the Government can explain why the FCA sweeps far broader than has been traditionally understood. Or, perhaps there are meaningful ways to differentiate these examples or other reasons why the FCA would not apply even if this Court accepted the Government's broad theory of what it means to "provide" money under the FCA. But, the Government has not engaged with or appreciated the drastic consequences that might follow if this Court were to accept its primary argument.

I express no definitive view on the merits of the Government's broad theory. I simply note that if this question returns to us, we ought to carefully consider what the Government's theory might mean for the scope of the FCA.

### III

The Government offered this Court another avenue to finding that the FCA applies to E-Rate reimbursement requests. It argued that any request for money made to the Administrative Company qualifies as a "claim" because the

Administrative Company is an "agent of the United States." §3729(b)(2)(A)(i). But, if the Government is correct, then the E-Rate program would seem to run afoul of the Government Corporation Control Act (GCCA), 59 Stat. 597.

The GCCA provides that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." 31 U. S. C. §9102. In other words, the statute "prohibit[s] [the] creation of new Government corporations without specific congressional authorization." *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 390 (1995).

The FCC should be familiar with the GCCA. In the Telecommunications Act of 1996, 110 Stat. 56, Congress directed the FCC to establish a set of universal service programs. See 47 U. S. C. §254. In its first attempt at carrying out that statutory command, the FCC instructed the Carrier Association to create the Administrative Company as an "*independently functioning* not-for-profit subsidiary" that would "assure significant industry-wide representation in the administration" of universal service programs. *In re Changes to Bd. of Directors of Nat. Exchange Carrier Assn., Inc.*, 12 FCC Rcd. 18400, 18401, 18415 (1997) (emphasis added). The FCC also directed the Carrier Association to create two freestanding corporations to manage the E-Rate program and another universal service initiative. *Id.*, at 18430–18431.

Shortly thereafter, a group of Senators inquired whether the FCC had exceeded its authority when it directed the Carrier Association to create private corporations. In response to these inquiries, the General Accounting Office (GAO), known today as the Government Accountability Office, conducted an investigation. The GAO did not object to the FCC's use of the Carrier Association as "a neutral third-party administrator." GAO, Testimony Before the Subcommittee on Telecommunications, Trade and Consumer Protec-

tion, Committee on Commerce, House of Representatives, TELECOMMUNICATIONS: FCC Lacked Authority To Create Corporations To Administer Universal Service Programs 2 (GAO/T–RCED/OGC–98–84, 1998). Nor did it object to the FCC's instruction to create the Administrative Company—the "independently functioning, not-for-profit subsidiary" of the Carrier Association. 12 FCC Rcd., at 18415; see GAO Testimony, at 18–20. But, the GAO *did* object to the FCC's attempt to create government corporations. *Id.*, at 13. The GAO determined that the FCC had violated the GCCA by attempting to establish freestanding corporations to manage certain universal service programs and "act as its agents in carrying out functions assigned by statute to the [FCC]." *Ibid.* In light of this report, Congress instructed the FCC to "propose a new structure for the implementation of universal service programs." H. R. Conf. Rep. No. 105–504, p. 87 (1998).

The FCC responded by asking Congress for "specific statutory authority . . . to create or designate . . . one or more entities, such as the Universal Service Administrative Company, to administer the federal universal service support mechanisms." Report in Response to Senate Bill 1768 and Conference Report on H. R. 3579, 13 FCC Rcd. 11810, 11819 (1998). But, Congress refused the agency's request.

Congress's choice left the FCC with the "independently functioning" Administrative Company, 12 FCC Rcd., at 18415, but *no* government corporations to "act as its agents," GAO Testimony, at 13. The FCC published a final rule appointing the Administrative Company as the permanent administrator of the Universal Service programs. See Final Rule, Changes to the Board of Directors of the National Exchange Carrier Association, Inc., Federal-State Joint Board on Universal Service, 63 Fed. Reg. 70564–70565, 70572–70573 (1998) (codified, as amended, at 47 CFR §54.701).

The upshot is that the Administrative Company was originally understood to be—and the lawfulness of the E-Rate program turned upon the Administrative Company being—an independent, nongovernment entity. To this day, Congress has never passed a law approving the Administrative Company as a government corporation, nor has it authorized the FCC to formally label the Administrative Company a subagency. The Government nevertheless contends before this Court that the Administrative Company is now an agent of the United States.

Whether the Administrative Company is in fact an agent of the United States is a complex question that we do not resolve today. That determination appears to turn on the kind and degree of control that the FCC exercises over the Administrative Company. And, those issues are the subject of another case that this Court will consider soon. See *Consumers' Research* v. *FCC*, 109 F. 4th 743 (CA5) (en banc), cert. granted, 604 U. S. 1029 (2024). I express no view on whether the Government's agency argument is correct. I simply note that *if* the Government is correct, then it will need to explain how the E-Rate program's current structure is compatible with the GCCA. The Government relied on the independent, nongovernmental nature of the Administrative Company to establish compliance with the GCCA. Now, the Government asserts that the Administrative Company is essentially an arm of the FCC. I doubt that the Government can have it both ways.

IV

The Court resolves this case on a narrow, fact-specific ground. In a future case, however, we may need to confront the Government's other arguments—namely, that the FCA applies to funds that private parties pay to other private parties, and that the Administrative Company is an agent of the United States. If these issues return to us, I hope we will carefully consider their consequences.

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS joins, concurring.

I join the Court's opinion, which decides a narrow statutory question regarding the scope of the False Claims Act. That statutory issue arises in the context of a *qui tam* suit. The Act's *qui tam* provisions raise substantial constitutional questions under Article II. See, *e. g.*, *United States ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U. S. 419, 442 (2023) (KAVANAUGH, J., concurring); *id.*, at 449–452 (THOMAS, J., dissenting). Those constitutional questions are not before the Court in this case. But in an appropriate case, the Court should consider the competing arguments on the Article II issue.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None